NOTICE: All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports. If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-11723


COMMONWEALTH  vs.  DONOVAN K. SMITH.



Worcester.        November 6, 2015. - March 11, 2016.

Present:  Gants, C.J., Cordy, Botsford, Lenk, & Hines, JJ.


Homicide. Robbery. Attempt. Felony-Murder Rule.
    Constitutional Law, Admissions and confessions, Assistance
    of counsel. Evidence, Admissions and confessions,
    Videotape. Practice, Criminal, Admissions and confessions,
    Assistance of counsel, Capital case.




    Indictments found and returned in the Superior Court
Department on December 7, 2010.

    A pretrial motion to suppress evidence was heard by Janet
Kenton-Walker, J., and the cases were tried before John S.
McCann, J.


    Aziz Safar for the defendant.
    Susan M. Oftring, Assistant District Attorney, for the
Commonwealth.


    BOTSFORD, J.  A Superior Court jury found the defendant

guilty of the attempted armed robbery and murder in the first

degree of Michelle Diaz on theories of extreme atrocity or

cruelty and felony-murder.  In this direct appeal from his

convictions, the defendant challenges the admission in evidence of his videotaped statement to the police, and the admission of an enhanced recording of a statement made by the defendant while he was left alone during the police interrogation. He requests relief pursuant to G. L. c. 278, § 33E. We conclude that the failure of the police to honor the defendant's right to terminate questioning, a claim the defendant did not raise below, created a substantial likelihood of a miscarriage of justice and requires the reversal of the defendant's convictions; the defendant is entitled to a new trial.

1. Background. From the evidence presented at trial, the jury could have found the following. On August 24, 2010, at approximately 12:45 P.M., Sara Ventura parked her automobile on Fairfax Road in Worcester. As she was getting out of the vehicle, she heard a loud scream and looked in the direction of the scream. She saw nothing, but a few seconds later, she heard what sounded like a gunshot. She then saw a young African-American man running very quickly down the street.[1] Around the same time, Carlos Tumer, who was in his apartment on Fairfax Road, heard a "pop" and looked outside the window, where he saw a woman, later identified as the victim, sitting in the driver's

_____

[1] The man had short hair, was approximately five feet, six inches tall, and was wearing dark clothes. Sara Ventura was unable to identify the man she had seen from a subsequent photographic array provided by police; the defendant's photograph was included in that array.

seat of a Lexus automobile with the front passenger's door open. Tumer also noticed a dark-skinned man wearing a black shirt and light blue jeans near the front of the vehicle, running away while appearing to adjust the back of his shirt. Tumer telephoned the police soon thereafter when he noticed that the victim had slumped forward and had blood on her neck.

At approximately 12:47 P.M., Officer Kevin Krusas of the Worcester police department was dispatched to Fairfax Road, where he observed the victim seated in the driver's seat of her blue Lexus, but leaning across the front passenger seat. The victim had been shot in the neck but still had a pulse, and fire fighters who arrived at the scene administered cardiopulmonary resuscitation. The victim was transported to the hospital, where she remained in critical condition for six days until life support measures were withdrawn and she died.

During their investigation, the police learned that Kenneth Cashman, a homeowner on Fairfax Road, had attached to his house a surveillance system consisting of several cameras that generated audio-video recordings of the surrounding areas. The police viewed the recordings, and although none of the cameras recorded the shooting itself, the recordings showed the victim's blue Lexus as it arrived on Fairfax Road. They also showed a male entering the front passenger seat of the Lexus; the Lexus being driven out of the video range of the cameras, but not out

of the system's audio range; and Ventura parking her vehicle on Fairfax Road.

The police retrieved the victim's cellular telephone and discovered that the last incoming call the victim received came from a telephone registered to William Madison.  Using global positioning information received from Madison's cellular telephone carrier, the police were able to locate Madison at his apartment on Vernon Street Place in Worcester, where he lived with his mother; his girl friend, Kassie Ago; and her young son.  On August 25, 2010, Detective Sergeant Gary Quitadamo and other Worcester police detectives went to Madison's home to speak with him regarding the shooting incident.  Madison agreed to go with them to the police station, where he was interviewed.[2]  While Madison was at the police station, police sought, received, and executed a search warrant for Madison's residence and seized marijuana, a cellular telephone registered to Madison, and a black, long-sleeved T-shirt near a washing machine.  The police had been informed by Madison's cellular telephone carrier that, within hours of the incident, Ago had contacted the carrier to change the existing telephone number and register the new number under a fictitious name.

The following day, Madison and Ago were each interviewed by the police concerning the August 24 shooting incident, but

---

[2] William Madison was not under arrest at that time.

neither of them provided any substantive information.  One month later, and after further investigation, the police arrested Madison and Ago in connection with the August 24 shooting incident.  On September 29, 2010, Madison and Ago, represented by separate counsel, entered into cooperation agreements with the Commonwealth pursuant to which each agreed to provide information about the shooting incident and to testify against the defendant in exchange for lesser sentences.  On October 7, the police also arrested Kenny Roman, a friend of Ago's; on January 7, 2012, represented by counsel, Roman entered into a cooperation agreement that called for him to provide information and testify against the defendant regarding the shooting incident in exchange for a lesser sentence.[3]

Madison, Roman, and Ago (collectively, cooperating witnesses) each testified at the defendant's trial that he or she participated in a plan with the defendant and his older brother, Marcus Young, to rob someone of money and drugs and then split the proceeds.  Roman, who was a friend of the victim and knew her to be a marijuana dealer, suggested the victim as

---

[3] Madison, Kassie Ago, and Kenny Roman had each been charged as an accessory to murder, a crime that carries a mandatory sentence of life imprisonment.  See G. L. c. 265, § 2; G. L. c. 274, § 2.  Pursuant to the cooperation agreements, all three of the witnesses were permitted to plead guilty to lesser offenses.  Madison and Ago received sentences in a house of correction; Roman received a sentence of from five to six years in State prison.

the target.  The plan was for the defendant to actually carry out the robbery.  Because the group believed -- based on information supplied by Roman -- that the victim might be armed, they agreed that the defendant should carry with him a gun; Madison supplied the gun.

The plan was executed on August 24, 2010.  Ago contacted the victim, arranged for a purchase of marijuana, and told the victim that her friend would be picking it up.  The pickup was to be on Fairfax Road in Worcester.  The defendant, Madison, and Young left Madison's apartment to walk to Fairfax Road, the defendant walking a few feet ahead of Madison and Young.  When they were approximately 500 feet away from the destination, Madison and Young stopped and the defendant continued walking toward Fairfax Road to meet the victim.  Madison lost sight of the defendant before the defendant reached and entered the victim's blue Lexus.  The next time Madison saw the defendant, he was running past Madison toward Madison's apartment.  Madison and Young followed, running behind the defendant.  According to Madison and Ago, once back in the apartment, the defendant stated several times that he had shot the victim.  The defendant returned the gun to Madison, who placed it in Ago's purse.  Ago and Madison then drove the defendant and Young back to Young's apartment, where Madison gave the gun to Young, who placed it in

a drawer in his bedroom.  According to Ago, Young later disposed of the gun by burying it.[4]

At the crime scene, the police recovered the following:  a can of tire sealant containing a hidden compartment filled with four plastic bags of marijuana from underneath the victim's Lexus near a rear tire; an envelope containing $250 in the driver's side door of the Lexus; a .380 caliber bullet casing in the driver's seat; and a spent projectile on the floor inside the vehicle that the Commonwealth's ballistician identified as being a hollow-point .380 bullet used in a semiautomatic firearm.  The black shirt the police had seized from Madison's apartment, identified by Ago as belonging to the defendant, was tested for blood and gunshot residue and tested negative for the presence of either.

On October 6, 2010, police arrested the defendant, who was eighteen years old, at a school program and brought him to the Worcester police station for an interrogation in connection with the incident.  Worcester police Detective Michael Tarckini led the interrogation, which lasted approximately one hour and thirty-five minutes and was recorded on audio-video tape.[5]

---

[4] We discuss in further detail, infra, the individual statements produced by each of the cooperating witnesses.

[5] The defendant was informed by Detective Michael Tarckini that the interrogation was being recorded, and he did not object.

Detective William Escobar and, briefly, Detective Lieutenant John Towns, both Worcester police officers, also participated in the interrogation. At the outset, Tarckini administered Miranda warnings to the defendant; the defendant signed a written waiver form and agreed to speak to the police. The defendant insisted to the detectives for some time that he had had no involvement in the August 24 shooting incident. However, he later admitted that he participated in a plan devised by Ago and Madison to rob the victim, but that the robbery failed after the victim became aware that he was attempting to rob her. He repeatedly denied shooting the victim. He told the police that he got out of the victim's automobile and ran away after he realized he could not obtain the drugs, that he did not have a gun, and that he heard gunshots as he was running away.[6]

On December 7, 2010, the defendant was indicted for murder in the first degree, G. L. c. 265, § 1, and attempt to commit armed robbery, G. L. c. 274, § 6. On January 4, 2012, the defendant filed a motion to suppress his statement to the police on the ground that the statement made was involuntary as a result of improper interrogation tactics used by the police in

---

[6] At a point soon thereafter in the interrogation, the defendant asked to speak to an attorney, and the questioning ended. The redacted version of the defendant's interview shown to the jury included his invocation. We discuss the defendant's interrogation in some detail, infra.

eliciting a confession.[7]  An evidentiary hearing was held before
a Superior Court judge at which Tarckini and Quitadamo
testified.  That judge denied the motion on June 12, 2012.  The
defendant's trial commenced before a jury and a different judge
on September 24, 2012,[8] and on October 2, the jury found the
defendant guilty of murder in the first degree on theories of
extreme atrocity or cruelty and felony-murder, as well as of
attempt to commit armed robbery.  He was sentenced to life in
prison without the possibility of parole on the murder charge
and a concurrent term of from four to five years on the charge
of attempt.  The defendant filed a timely notice of appeal to
this court.

 2.  Discussion.  a.  Admission of the defendant's
statement.  In this appeal, the defendant challenges the
admission of his statement to the police on two separate
grounds:  (1) during the custodial interrogation[9] the police

---

 [7] The defendant's motion to suppress did not challenge the
admissibility of his statement on the ground that the police had
failed to honor his request to terminate questioning.

 [8] The defendant was tried alone on the charges of murder in
the first degree and attempt to commit robbery.  Madison, Ago,
and Roman each testified against the defendant at trial,
pursuant to separate cooperation agreements.  Young, the
defendant's brother, did not testify at the defendant's trial.

 [9] When the police interviewed the defendant, he already had
been placed under arrest; as the judge who heard the motion to
suppress (motion judge) concluded, there was no question that
the interrogation by the police was custodial.

conducted, the defendant exercised his right to cut off questioning but the police improperly did not honor that exercise; and (2) the statement was induced by falsehoods, trickery, and promises of leniency improperly put forth by the defendant's police interrogators, and therefore was not voluntary.[10]  Before we consider the defendant's claims, we set forth additional facts about the interrogation.

i.  Facts.  After administering Miranda warnings to the defendant and obtaining his agreement that he understood the warnings and was willing to talk to the police, Tarckini, with periodic questions or statements inserted by Escobar, told the defendant the following:  the police had video footage of him sitting in the victim's Lexus and running from that vehicle after the gunshot was heard; there was deoxyribonucleic acid (DNA) and fingerprint evidence belonging to him in the Lexus;[11]

_____

[10] The defendant argues in his brief that both grounds on which he challenges the admission of his statement are to be reviewed under the harmless beyond a reasonable doubt standard. That is not correct.  As indicated previously, the defendant's pretrial motion to suppress raised only the second ground; the first was not presented in the motion or raised at trial, and therefore it is not preserved.  We review this first ground to determine whether admission of the statement created a substantial likelihood of a miscarriage of justice.  See Commonwealth v. Wright, 411 Mass. 678, 682 (1992), S.C., 469 Mass. 447 (2014).

[11] Neither at the time of the interrogation nor at any later time did the police have deoxyribonucleic acid (DNA) or fingerprint evidence that connected the defendant to the victim's Lexus.  The audio-video footage from the cameras on

people had identified him as the shooter; and the police had recovered his eyeglasses from Madison's apartment with the defendant's DNA on them.[12]  For approximately thirty minutes, the defendant's repeated responses to these assertions by the police were to the effect that he did not know what they were talking about, and he denied knowing the victim or the fact that she had been shot and killed.  Then, the following exchange occurred:

Defendant:  "I'm done."

Tarckini:  "You're done with what?"

Defendant:  "I'm done talking.  I don't wanna talk no more."

Tarckini:  "You don't wanna talk anymore?"

Defendant:  "No.  'Cause y'all really don't believe me."

Tarckini:  "It's -- We already tried to explain that to you, Donovan.  I don't think you get it."

Defendant:  "Yeah, I understand."

Tarckini:  "It's not believing."

Defendant:  "I understand, sir."

Tarckini:  "It's not believing.  It's what we know."

Defendant:  "Okay."

_____

Kenneth Cashman's house showed a person enter the Lexus, and thereafter showed a male running away from the area where the Lexus was parked, but the video depiction itself was not clear enough to permit an actual identification of the person or persons shown.

[12] This statement about the eyeglasses was false.  Although the defendant wore eyeglasses, the police never recovered eyeglasses in connection with their investigation of this case.

Tarckini:  "What the facts are."

Defendant:  "What the facts show."

Tarckini:  "Right."

Defendant:  "Right."

Tarckini:  "Right?"

Defendant:  "Yes."

Tarckini:  "We don't make stuff up.  We don't make people talk to us.  We don't make people pick people out.  We don't put people's fingerprints inside of a car.  We don't make up videos.  The facts are the facts."

When the defendant did not respond, Tarckini continued:

Tarckini:  "When we talk to people, we ask certain questions to gauge your truthfulness, things that I know you're not gonna lie about like name, address, who you live with, mom, dad, date of birth, stuff like that.  Then when we ask you questions about other things, your body reacts a certain way.  It's just a natural thing.  You can't help it.  Everyone does it.  So that's what I -- when you answer my questions and I say you're lying to me, your body's telling me that.  Not only your words but your body.  You understand?"

The defendant, who had remained completely silent during Tarckini's speech, spoke only to answer "yes" to the question whether he understood.  Tarckini again continued:

Tarckini:  "You have the opportunity now to give your side of the story, to maybe lighten the load, get a little bit off yourself.  And you're being a tough guy, in the sense that you're just gonna -- you're gonna dig in and sit in a hole and wait out the storm.  And I don't think you realize all the things that are gonna happen going forward.  We're trying to give you information so you can process all that.  What are you thinking about?"

Defendant:  "Life."

Tarckini:  "Think life's been tough to you?"

(The defendant nods, indicating yes.)

Tarckini:  "Yeah?  Sometimes life isn't fair, man. Sometimes we're in the wrong place at the wrong time. Sometimes circumstances just put you in a bad way.  I kinda think that's what happened here."

Approximately fifty seconds of silence passed, after which the defendant stated:  "I didn't shoot nobody," and then he proceeded to make a series of inculpatory responses to questions by the officers.  He described a plan among Ago, Madison, and himself to rob the victim, and detailed what happened after he got into the victim's automobile, including that he was in it on the day of the shooting.  He stated that the victim picked him up in her automobile, they drove around together before parking on the street, and the victim asked him for the money multiple times, saying that the defendant better not be robbing her; that when he reached for the can containing the marijuana, the victim pulled it away and held it outside the window, out of his reach; that the victim then called out for help; and that when he realized he could not obtain the drugs, he fled and heard gunshots as he ran away.  He consistently denied having a gun, seeing the victim with a gun, and shooting her.

Approximately twenty minutes after the defendant made these statements, the two detectives left the defendant alone in the interrogation room for approximately six minutes; the video and

audio recording system were still operating.  The defendant sat in the same chair he had been in for the entire interview, and muttered something to himself to the effect of, "Why'd you shoot her?  You didn't even shoot the bitch.  You didn't shoot her.  You didn't fucking shoot her."[13]  When the detectives returned, the defendant admitted that after the attempted robbery, he went back to Madison's house to change his clothes, and the interrogation ended soon thereafter, following the defendant's request for an attorney.[14]

---

[13] There is much dispute regarding the exact statement made by the defendant while he was alone in the interrogation room. Apparently after listening to a version of the audio-video recording that had been enhanced in some fashion to clarify the audio feature (enhanced version), the motion judge found that the defendant stated, "Why'd you shoot her?  Why'd you shoot the bitch?"  At trial, both Tarckini and Detective Sergeant Gary Quitadamo were permitted to testify to their own understanding of what the defendant said, based on their listening to the enhanced version -- which was the version admitted in evidence as a trial exhibit.  In his closing argument, the prosecutor argued that the defendant said, "Why did you shoot her?  I didn't even shoot the bitch.  I didn't shoot her. . . .  You can't fucking shoot her."  Our own review of the enhanced recording has led us to conclude that the defendant's statement was the one we have quoted in the text.

[14] The audio-video equipment in the interrogation room continued to record after the defendant requested an attorney. Our review of that portion of the unredacted recording indicates that the officers, including Detective Lieutenant John Towns, continued to engage the defendant regarding the investigation of the case.  The following exchange occurred between the officers and the defendant outside the interrogation room and after the defendant had requested an attorney:

ii. The defendant's claims. The defendant contends that although he initially waived his Miranda rights, he later invoked his constitutional right to remain silent when he said that he was "done talking," an invocation that the police did not "scrupulously honor." Miranda v. Arizona, 384 U.S. 436, 444-445, 473-474, 478-479 (1966). See Michigan v. Mosley, 423 U.S. 96, 102-104 (1975). The argument is framed as one of ineffective assistance of trial counsel for failure to move to suppress the admission of the defendant's inculpatory responses to the police based on this invocation. See Commonwealth v. Williams, 453 Mass. 203, 207 (2009), citing Commonwealth v. Wright, 411 Mass. 678, 682 (1992), S.C., 469 Mass. 447 (2014).

---

Towns: "What we wanted to have an opportunity for you to do was tell us if something happened. Alright. You gotta know that these guys are telling the truth."

Defendant: [inaudible]

Tarckini: "We're not trying to trick you."

Towns: "Listen. Hey, listen."

Tarckini: "Listen to us."

Towns: "Hey, if you change your mind, wanna talk to these guys, alright, tell us downstairs. A bad decision . . . [inaudible]. If something happened inside the car that wasn't like you just pull out the gun and start shooting, you know what I mean, if it's not what happened, then you need to have an opportunity to say that. And today gives you a good form of credibility to say that. Mitigates for sure."

Tarckini: "We're not trying to trick you."

The Commonwealth argues that the defendant's claim must fail because, even if trial counsel had brought a motion to suppress raising a claim of invocation of the right to remain silent, the motion would not have succeeded. See Williams, supra. In the Commonwealth's view, the defendant's statement that he was done talking was an ambiguous remark rather than a clear, unequivocal invocation of his right to remain silent, and the fact that the defendant thereafter continued speaking supports the conclusion that he did not intend to invoke the right when he made the remark about being "done." We take the same view as the defendant.

"It is clear that a defendant has not only the right to remain silent from the beginning but also a continuing right to cut off, at any time, any questioning that does take place." Commonwealth v. Bradshaw, 385 Mass. 244, 265 (1982). However, if a defendant has waived his or her Miranda warnings and later wishes to remain silent, the invocation of that right "must be clear and unambiguous[], such that 'a reasonable police officer in the circumstances would understand the statement to be an invocation of the Miranda right.' . . . Whether the defendant has met this burden is a fact-specific determination to be made based on the totality of the circumstances" (citation omitted). Commonwealth v. Howard, 469 Mass. 721, 731 (2014), citing

Commonwealth v. Almonte, 444 Mass. 511, 519, cert. denied, 546 U.S. 1040 (2005).

In these circumstances, the defendant's statement, "I'm done," by itself, was ambiguous, coming as it did as a nonresponse to a long series of statements by Tarckini and Escobar about what the police already knew.  In this context, Tarckini's question to the defendant, "You're done with what?" was an appropriate effort to clarify.  See Commonwealth v. Santos, 463 Mass. 273, 286 (2012).  See also Commonwealth v. Hearns, 467 Mass. 707, 718 (2014).  But the defendant's immediate and direct answer, "I'm done talking.  I don't wanna talk no more," was certainly a clarifying response to Tarckini's inquiry, one that resolved completely the previous ambiguity, and asserted in no uncertain terms the defendant's desire and intention to end the interrogation.  See Howard, 469 Mass. at 733 n.13.[15]  However, instead of accepting the defendant's

---

[15] In Commonwealth v. Howard, 469 Mass. 721, 733 n.13 (2014), this court stated:

"[W]e take the word 'stop' to mean what it says.  A suspect's or defendant's use of the word 'stop,' or the phrase, 'I would like to stop at that point,' in this context should raise a red flag for an interrogating police officer -- a signal that it is necessary at the very least for the officer immediately to pause in order to reflect on what the defendant has just said, and to consider whether the defendant is seeking to invoke his right to remain silent" (emphasis in original).

invocation and terminating the interview, Tarckini, after repeating the defendant's answer,[16] launched into a lengthy monologue in an apparent effort to convince the defendant to keep talking -- an effort that succeeded. This was not proper. See Hearns, supra at 719.[17]

---

The same is true of the phrases, "I'm done talking" and "I don't wanna talk no more."

[16] We have stated that, when a defendant makes an ambiguous statement concerning an intent to stop questioning, the police, in seeking to clarify the defendant's meaning, may appropriately ask a clarifying question, but ordinarily the effort to clarify should be limited to one question. See Commonwealth v. Santos, 463 Mass. 273, 286-287 (2012). Here, Tarckini followed the defendant's clarifying answer with another question that repeated the defendant's last answer, "You don't wanna talk no more?" -- to which the defendant responded, "No," and then added a reason: "'Cause y'all really don't believe me." We do not share the Commonwealth's view that Tarckini's follow-up question was simply an exercise of "good police practice." Rather, the question appears to have been an unnecessary repeat of a question that already had been answered very clearly. Moreover, the defendant's response was consistent with his prior statement of intent to stop the questioning, and not, as the Commonwealth suggests, one that merely reflected the defendant's ongoing frustration with the refusal of the police to believe what he was saying. Postinvocation responses "to further interrogation may not be used to cast retrospective doubt on the clarity of the initial [invocation] itself" (citation omitted). Id. at 287.

[17] Although the defendant clearly was willing to speak before stating to the police that he was done talking, he said very few words in response to Tarckini's soliloquy extending for several minutes after that statement, which further indicates the defendant's intention to remain silent. Contrast Commonwealth v. Senior, 433 Mass. 453, 463 (2001), quoting Commonwealth v. Pennellatore, 392 Mass. 382, 387 (1984) (defendant's request to stop questioning "must be interpreted in the context of his willingness to talk both immediately prior to and subsequent to" that point).

We conclude that the defendant has met his burden to establish that he clearly stated his intent to cut off further questioning by the police; "his choice of words fell well within the range of cases where we have found a clear and unequivocal invocation." Hearns, 467 Mass. at 718. See, e.g., id. at 717 (defendant's postwaiver statement, "Well then, I don't want to talk. I haven't got nothing to say," was clear invocation). See also Howard, 469 Mass. at 732-733 (stating, "I would like to stop at that point" sufficient to invoke right to silence); Commonwealth v. Santana, 465 Mass. 270, 277, 282 (2013) (postwaiver statement that defendant could not "say any more" was clear invocation of right to silence); Santos, 463 Mass. at 285 (postwaiver statement that "I'm not going on with this conversation" in itself constituted clear invocation). The police, however, continued to interrogate the defendant, and the defendant responded to their questions for the next fifty-three minutes, making a number of inculpatory responses.

"[T]he admissibility of statements obtained after the person in custody has decided to remain silent depends under Miranda on whether his 'right to cut off questioning' was 'scrupulously honored.'" Mosley, 423 U.S. at 104. The factors identified in Mosley to evaluate this issue all point to the conclusion that scrupulous honoring of the defendant's right did

not occur here.[18]  That is, the police did not immediately cease questioning the defendant; the questioning continued almost without a pause, and without a fresh set of Miranda warnings; and the scope and subject matter of the interrogation remained the same as before the invocation -- the defendant's involvement in the victim's death.  See id. at 106-107.  See also Commonwealth v. Taylor, 374 Mass. 426, 433-434 (1978).  In these circumstances, a motion to suppress the defendant's statement to the police on the ground of invocation of the right to remain silent would have been successful, see, e.g., id. at 433-436, and trial counsel's failure to raise this ground constituted error.  See Wright, 411 Mass. at 682.

The defendant advances a separate but related claim that what he stated while he was alone in the interrogation room (volunteered statement) should not have been admitted in evidence.  The defendant argues that the volunteered statement was wholly ambiguous and that, in the circumstances, its admission was more prejudicial than probative, and the trial

---

[18] We have described the Mosley factors as follows:  whether "the police (1) had immediately ceased questioning; (2) resumed questioning 'only after the passage of a significant period of time and the provision of a fresh set of warnings'; and (3) limited the scope of the later interrogation 'to a crime that had not been a subject of the earlier interrogation'" (citation omitted).  Commonwealth v. Clarke, 461 Mass. 336, 344 (2012).  See Michigan v. Mosley, 423 U.S. 96, 106-107 (1975).

judge abused his discretion in admitting it.[19]  Our plenary

review of this case pursuant to G. L. c. 278, § 33E, persuades

us that the volunteered statement was not admissible for a

reason different from the one or ones advanced by the defendant.

See Commonwealth v. Bell, 460 Mass. 294, 295, 306 (2011), S.C.,

473 Mass. 131 (2015); Commonwealth v. Silva-Santiago, 453 Mass.

782, 805-810 (2009).

As discussed, when the defendant invoked his right to

terminate questioning, the police were required immediately to

end the interview.  At that point, all questioning should have

ceased, and it follows that the recording of the interview also

should have ceased.  That is not what happened.  Rather, the two

detectives continued to interrogate the defendant and the

recording equipment continued to operate, including during the

time, postinvocation, that the detectives left the defendant

sitting for approximately six minutes by himself in the

interrogation room, during which time he made the volunteered

statement.  The critical question is "whether . . . the evidence

---

[19] The defendant contends that this issue was preserved. That is not clear.  The Commonwealth points out that, although the defendant's trial counsel mentioned the lack of clarity about the meaning of the defendant's volunteered statement, the principal reason he objected to its admission at trial was the same issue he had raised in his motion to suppress:  lack of voluntariness.  As next explained in the text, we decide that the volunteered statement was not admissible on grounds different from any suggested by the defendant, and therefore, we need not decide the preservation question.

to which instant objection is made has been come at by exploitation of [the primary] illegality or instead by means sufficiently distinguishable to be purged of the primary taint" (citation omitted).  Wong Sun v. United States, 371 U.S. 471, 488 (1963).  See Bradshaw, 385 Mass. at 258.  It is clear that without the audio-video recording, there would be no evidence of the defendant's statement -- indeed, as one of the police officers, Quitadamo, testified, the only way the police were able to make out the defendant's words in the volunteered statement at all was through enhancement of the sound quality of the audio recording by using some technological means to reduce the ambient noise.  The Commonwealth should not be permitted to take advantage of a recording that should not have been made by introducing the recording in evidence.  Cf. G. L. c. 272, § 99 P.  Adherence to the principle that the defendant's constitutional right to cut off questioning must be "scrupulously honored" leads us to conclude that, in the particular circumstances presented here, all portions of the defendant's statement procured after he invoked his right to remain silent were inadmissible, including the volunteered statement.[20]

---

[20] The defendant's second challenge to the admissibility of his statement rests on the ground that the police undermined the voluntariness of his statement by using lies, tricks, and implied promises of leniency to obtain the statement.  The

The remaining question is whether the erroneous admission of the defendant's statement, including the volunteered statement, gave rise to a substantial likelihood of a miscarriage of justice because the statement was likely to have affected the jury's verdict. See Wright, 411 Mass. at 682. We conclude that it did. The defendant admitted to participating directly in the group plan to rob the victim, and more particularly to being the one who was charged with carrying it out, and although he denied shooting the victim, the jury were certainly free to disbelieve him on that point. "[A] defendant's own confession is probably the most probative and damaging evidence that can be admitted against him."[21] Arizona v. Fulminante, 499 U.S. 279, 296 (1991), quoting Bruton v. United States, 391 U.S. 123, 139-140 (1968) (White, J., dissenting). It is true that the three cooperating witnesses each described the defendant's involvement in the plan to rob

---

motion judge concluded that the police tactics were permissible and did not affect the voluntariness of the defendant's statement. Given our conclusion that the defendant's statement was inadmissible because of his invocation of the right to silence, we need not resolve the defendant's involuntariness claim.

[21] It certainly may be inferred that the prosecutor considered the defendant's statement to be important, weaving it into his closing argument at several different points. See Howard, 469 Mass. at 749. And during their deliberations, the jury asked to view the audio-video recording of the interrogation and the enhanced audio recording of the defendant's volunteered statement.

the victim, and two of them quoted the defendant as saying that he shot the victim, but each of the three was also a direct participant in the robbery plan and had been charged as an accessory to the victim's murder, and the three witnesses' testimony was conflicting with respect to the defendant's role in the scheme:  according to Roman, the idea to rob the victim came entirely from Ago and Madison; Madison testified that the idea was Roman's; and only Ago testified that the defendant and his brother were the source of the idea.  Moreover, it was undisputed that the gun used in the shooting was Madison's; that Roman was the direct contact to the victim and the source of the information that she might be armed; and that the idea to carry a gun was not the defendant's.  The ability of defense counsel to take advantage of these points, however, was impaired because the defendant's own statement directly corroborated much of the witnesses' version of events.  Finally, this is not a case in which other types of evidence, independent of the cooperating witnesses' testimony, pointed convincingly to the defendant's guilt.  No forensic evidence -- for example, DNA or fingerprints -- connected the defendant to being inside the victim's vehicle or being involved in the incident more generally; the murder weapon was never recovered; Ventura and Tumer, the two witnesses who saw a male fleeing the scene, could not identify the defendant as the assailant; and the audio-video recordings taken

from Cashman's home did not enable a viewer to discern the assailant's identity.  In view of all the circumstances, we conclude that the admission of the defendant's statement likely influenced the jury's verdicts, and therefore created a substantial likelihood of a miscarriage of justice.  The defendant's convictions must be reversed and the case remanded for a new trial.[22]

b.  Review under G. L. c. 278, § 33E.  We address an additional issue raised by our review of this case under G. L. c. 278, § 33E.  The jury found the defendant guilty of murder in the first degree under theories of felony-murder and extreme atrocity or cruelty.[23]  In our view, the trial evidence did not adequately support a guilty finding under the second theory. The victim was killed by a single gunshot that entered her neck as she sat in her automobile.  Considering the evidence in the

---

[22] A final point about the defendant's statement is in order.  After waiving his Miranda rights, the defendant spoke to the police for approximately thirty-five minutes before invoking his right to silence.  During that portion of the interrogation, the defendant repeatedly and consistently responded to the interrogating officers' statements about their self-described knowledge of the defendant's involvement in the victim's killing with denials.  Although this portion of the statement preceded the defendant's invocation, it should not be admitted at any retrial of this case.  Accusations by the police, met with denials by a defendant, are not admissible by themselves.  See Commonwealth v. Spencer, 465 Mass. 32, 48 (2013); Commonwealth v. Womack, 457 Mass. 268, 274 (2010).

[23] The Commonwealth also proceeded on a theory of deliberate premeditation, but the jury did not find the defendant guilty under that theory.  See note 26, infra.

light most favorable to the Commonwealth, there was evidence, supplied by the defendant in his statement, that he had been in the victim's automobile right before she was shot. In addition, Madison and Ago testified that when the defendant returned to Madison's apartment from Fairfax Road, he stated that he had shot the victim, and there was evidence that a few seconds before the shot was fired, a yell or scream by a female voice could be heard. These witnesses also testified that the defendant knew the gun was loaded. Other than what has just been summarized, however, there was no evidence presented about the actual circumstances of the shooting.[24] Moreover, although Madison testified that the bullets in the gun were hollow-point bullets, there was no evidence that the defendant knew that the gun contained hollow-point bullets.[25] Furthermore, the evidence indicated, without dispute, that the gun in question was Madison's, that Madison himself had loaded it, and that it was the defendant's brother's idea for the defendant to bring a gun in response to information supplied by Roman that the victim might be armed. In terms of the Cunneen factors, see

---

[24] In addition, as discussed supra, the defendant's statement to the police about being in the vehicle with the victim should not have been admitted at trial.

[25] There also was no evidence about whether the particular injuries sustained by the victim were likely to have been caused by the use of a hollow-point bullet, as opposed to some other kind of bullet.

Commonwealth v. Cunneen, 389 Mass. 216, 227 (1983), we conclude that the record contains no evidence from which the jury properly could find that the defendant was indifferent to or took pleasure in the victim's death, that the victim was conscious after being shot, that she sustained extensive physical injuries apart from the gunshot, that there were multiple blows, that excessive force was used, that the instrument used to kill her was unusual, or that the means that brought about her death were disproportional to the means needed to cause death. In any retrial, therefore, the Commonwealth may proceed only under the theory of felony-murder.[26]

3. Conclusion. The defendant's convictions are reversed, the verdicts are set aside, and the case is remanded to the Superior Court for further proceedings consistent with this opinion.

So ordered.

---

[26] The Commonwealth may not proceed on the theory of extreme atrocity or cruelty for the reasons discussed in the text. With respect to the theory of deliberate premeditation, this theory was presented to the jury and listed on the verdict slip, but the jury left the line associated with the theory blank. After the foreperson stated the jury's verdicts on the two charges (murder and attempted armed robbery), the defendant requested that the jurors be polled individually. When polled, each deliberating juror stated that he or she found the defendant not guilty of murder in the first degree on a theory of deliberate premeditation. Accordingly, double jeopardy principles preclude the Commonwealth from proceeding against the defendant on this theory in any retrial. Contrast Commonwealth v. Carlino, 449 Mass. 71, 76-80 (2007). Contrast also Commonwealth v. Brown, 470 Mass. 595, 603-604 (2015).