APPEALS COURT 
 
 COMMONWEALTH vs. JOSEPH PIARD

 
 Docket:
 23-P-846
 
 
 Dates:
 July 1, 2024 – April 18, 2025
 
 
 Present:
 Shin, Grant, & Smyth, JJ.
 
 
 County:
 Suffolk
 

 
 Keywords:
 Rape. Constitutional Law, Admissions and confessions, Voluntariness of statement. Evidence, Admissions and confessions, Voluntariness of statement, Videotape, Expert opinion. Rape-Shield Statute. Witness, Expert. Practice, Criminal, Motion to suppress, Waiver, Argument by prosecutor. Waiver.
 
 

      Indictment found and returned in the Superior Court Department on October 24, 2019.
     A pretrial motion to suppress evidence was heard by Peter B. Krupp, J., and the case was tried before Mary K. Ames, J.
     A motion for a stay of execution of sentence, filed on January 31, 2024, also was heard by Mary K. Ames, J., and a second motion for a stay of execution of sentence, filed on May 2, 2024, was heard in the Appeals Court by Singh, J.
     Edward J. O'Brien for the defendant.
     Molly Paris, Assistant District Attorney, for the Commonwealth.
     GRANT, J.  The defendant, Joseph Piard, a rideshare driver, was convicted by a Superior Court jury of rape of his passenger (victim).  On appeal, the defendant argues, among other things, that he invoked his right to remain silent when he told police that if they would not show him "proof" that his sperm cells were in the victim's vagina, "I can't answer any other questions."  He waived that argument, however, by not raising it in his motion to suppress; thus, we will not reach it for the first time on appeal.  The proper course is for the defendant, if he chooses to do so, to raise the issue as an ineffective assistance of counsel claim in a motion for new trial, so that the factual record can be developed, and the trial judge can appropriately decide in the first instance whether any illegally obtained statements created a substantial risk of a miscarriage of justice.  Concluding that the other arguments that the defendant raises are unavailing, including his argument that his statements to the police were involuntary, we affirm the judgment.[1]
     Background.  A Suffolk County grand jury indicted the defendant for rape by putting his penis into the victim's vagina.[2]  The defendant moved to suppress his statements and evidence derived from a buccal swab that he provided to police on August 11, 2019, as well as statements he made to police on September 24, 2019.  After an evidentiary hearing in October 2020, a Superior Court judge (motion judge) denied the motion.
     About two years later, the case was tried over seven days before a different judge (trial judge).  The jury heard evidence that in the summer of 2019, the victim was a twenty year old college student living alone with her elderly Chihuahua in an apartment on Beacon Street in the Back Bay section of Boston.  On the evening of July 30, while watching television at her apartment with a friend, the victim drank a bottle of wine and became intoxicated.  They walked to the friend's apartment in the Fenway neighborhood, where the victim drank a lot of vodka.  She was extremely drunk, slurring her words and barely holding her eyes open.  She needed to go home to take care of her dog and decided that it would not be safe to walk home as drunk as she was.
     Using an application on her cell phone, the victim ordered a ride from a rideshare service.  She was so drunk that she typed the wrong street number for her address and could not figure out how to correct it, so she decided she would just tell the driver the correct street number.  As the victim was leaving the building, she tripped and fell, and her friend helped her up.
     At 1:45 A.M. on July 31, the friend helped the victim into the back seat of the rideshare car, a Mitsubishi Mirage driven by the defendant.  In the car were two other passengers who were going to Cambridge.  The defendant took the victim to Beacon Street, where she got out.  At 1:55 A.M., the defendant signaled to the rideshare service that the victim's ride had ended, and the service charged the victim $3.53 for the ride.  It was the wrong address, so the victim got back into the car and asked the defendant to drive along Beacon Street until she recognized her building.  The defendant told the victim to wait until he dropped off the other passengers.  The victim thought "well, this will take a while," and relaxed into the back seat and passed out.
     At 2:06 A.M., the defendant dropped off the other passengers in Cambridge.  The defendant went up to a Harvard University police officer and said, "Hey, this girl's really drunk," motioning toward the Mitsubishi, where the officer saw the silhouette of the victim sleeping in the back seat.  The officer asked if the victim was a Harvard student, because if so he would take responsibility for her; the defendant replied that she was not.  In response to the officer's questions, the defendant said that he was a rideshare driver and the victim lived on Beacon Street; the officer told the defendant to take the victim home.
     The victim's next memory after passing out in the back seat was waking up in the front passenger seat of the Mitsubishi at about 7 A.M.  She was still drunk.  The defendant was in the driver's seat, and the car was moving.  The victim did not know where she was and did not remember anything that had happened since she got into the car.  The defendant said, "Oh, you finally woke up, you've been in my car all night."  When the victim said that she needed to get home to take care of her dog, the defendant replied in an annoyed tone, "Well, if you want to go home, you're going to have to pay me $30, because you were in my car all night."  Concerned for her dog, the victim agreed to pay the defendant by an online payment application after he took her home, and he dropped her off.  At 7:41 A.M., the defendant sent a text message to the victim stating, "Hey hope you're . . . all right and your dog!!"
     The victim walked her dog, took a bath, and fell asleep.  That afternoon she woke up feeling hungover, and her jaw was sore on both sides.  At 12:55 P.M., the defendant sent her another text message stating, "Are you feeling ok now?"  The victim saw the text messages from a number she did not recognize and realized they were from the defendant; she felt very uneasy because she did not know how he got her phone number, which she thought was supposed to be shielded from the driver by the rideshare service.[3]  Confused, the victim asked the defendant by text message, "What happened last night?  I was very drunk and don't remember."  When the defendant suggested that he call her, she claimed she was at work because she wanted to keep their communications by text message.  By text message, the defendant said, "you passed out in the back seat . . . so I let you sleep in the back in the car and I stayed in there with you watching over you and make sure u ok."  He said, "I tried to wake u up but that wasn't possible at all."  He said he had talked to a "campus cop" but was concerned that she "might get kicked out" of college if the police were involved.  The victim asked, "Did anything else happen?  I am just worried.  I was by myself and I [was] really drunk."  The defendant replied, "No u were just sleeping in the back of the car."
     Feeling uneasy about what had happened, that evening the victim went to Massachusetts General Hospital and underwent an examination for the collection of evidence.  A sexual assault nurse examiner (SANE nurse) took swabs from areas of the victim's body including her vagina, where there was clear fluid near the cervix and white fluid below it.
     Boston police Detective Jesse Goff responded to the hospital and photographed the victim's phone depicting the rideshare receipt, text messages, and payment requests.  Using the information in them, Detective Goff contacted the defendant and asked him to meet for an interview, and he agreed.
     In an audio-recorded interview on August 11, 2019, the defendant told police that after he tried to drop the victim off, he drove to Cambridge where the Harvard University police officer told him to bring the victim to a police station, but she was so drunk that he did not want to involve the police because she might get in trouble with her school.  The defendant said he then drove the victim back to her address, but she would not get out of the car because she was so drunk that she would not wake up when he called her name and shook her.  The defendant drove to the Mattapan section of Boston and sat in the car while the victim slept for over five hours and then awoke, still drunk.  The defendant denied touching the victim anywhere except her arm, which he shook trying to wake her up; then he admitted he might have touched her breast accidentally.  While the victim was sleeping in the back seat, her dress rode up to her hips and the defendant saw that she was not wearing underwear.
     Asked what he did during those five hours, the defendant said that he sent a text message to his friend Alexandra.  He displayed his phone to police and permitted them to photograph text messages stating as follows.[4]  At 3:34 A.M., he told Alexandra, "I have a situation."  At 12:53 P.M., he told Alexandra, "There was a drunk girl in the back of my car last night" adding a little while later that "she had no underwear."  When Alexandra asked, "U saw her vagina?!", the defendant replied, "Yup by accident," and "Maybe she was expecting an appointment."  A short time later, the defendant wrote that the victim was "texting me now," "[s]aying she was very drunk and [asking] what happened last night."  Alexandra replied, "U better be careful so she don't say u raped her," followed by "If she thinks she was raped she would go to the hospital . . . and they do a rape kit," and "She has like 24 or 48 hours to do it."  When Alexandra wrote, "Girls are stupid," the defendant replied, "That's what I am saying too," "Because she literally was sleeping the whole time," and "I tried to wake her so many times."  He said that the victim "made me go through hell" and he "[s]hould have just left her in the street."
     In response to direct questions from Detective Goff, the defendant denied putting his penis into the victim's vagina.  Detective Goff explained that the victim did not know what happened to her, but she had undergone an examination in which samples were taken from all over her body.  Before leaving the interview, the defendant permitted police to take a deoxyribonucleic acid (DNA) sample by swabbing the inside of his cheek.
     On September 9, 2019, Detective Goff learned that the Boston police crime laboratory had detected sperm cells on a vaginal swab taken from the victim.  That day, Detective Goff telephoned the defendant on a recorded line and told him that sperm cells had been found.  The defendant replied, "I didn't touch her.  I didn't like have sex with her."  Detective Goff said that testing would be done to compare the DNA in the sperm cells with that in the defendant's sample.  Asked if he wanted to explain, the defendant reiterated that he had not done anything to the victim.
     Comparison testing revealed that the defendant was included as a possible contributor to the DNA in the sperm cells on the swab from the victim's vagina.  The DNA profile was extremely rare.[5]  On September 20, 2019, Detective Goff received by e‑mail a DNA report of that testing, and based on it, obtained an arrest warrant.
     On September 24, 2019, after the defendant was arrested, Detective Goff informed the defendant of his Miranda rights, and the defendant agreed to speak to the police.  During an interview that was audio-video recorded, the defendant at first repeated the version of events he had told police on August 11.  Then Detective Goff said that DNA testing showed "proof" that the defendant's sperm cells were in the victim's vagina.[6]  The defendant repeatedly asked to see the DNA report, at one point saying, "I can't answer any other questions if I don't have any proof that my, my cells were inside of her vagina."  The interview continued without police showing the defendant the DNA report.  The defendant eventually admitted that he had put his penis in the victim's vagina while she was "[s]ort of asleep" and she did not want or invite him to do it.  The defendant said that he pulled his penis out of the victim and ejaculated outside the car.  The defendant said that he photographed the victim using Snapchat and sent the photograph to a friend, but the communication was now gone.
     The defense theory was that the Commonwealth had not proven the victim's incapacitation or lack of consent to sex.  The defendant testified that the victim did not seem intoxicated, was awake and chatting, and initiated sex with him.  He also testified that in the August 11 interview and the September 9 telephone call, he denied having sex with the victim because he wanted police to leave him alone.  The defendant further testified that in the September 24 interview he admitted raping the victim because he was panicked and traumatized, though in fact their intercourse was consensual.
     Discussion.  1.  Motion to suppress.  The defendant argues that the motion judge erred in denying the motion to suppress his August 11 and September 24 statements to police and evidence of his buccal swab.[7]  In reviewing the denial of the motion to suppress, we "conduct an independent review" of the motion judge's "ultimate findings and conclusions of law."  Commonwealth v. Hart, 493 Mass. 130, 135 (2023), quoting Commonwealth v. Tremblay, 480 Mass. 645, 652 (2018).  To the extent that the motion judge's findings were based on the testimony of Detective Goff, the sole witness at the suppression hearing, those findings "are accorded deference and are not set aside unless clearly erroneous."  Hart, supra, quoting Tremblay, supra at 655.  To the extent that the motion judge's findings were based on documentary evidence, including the recordings of the defendant's interviews and the telephone call, we review those findings de novo because "we are in the same position as the motion judge to determine what occurred."  Hart, supra, quoting Commonwealth v. Hammond, 477 Mass. 499, 502 (2017).
     a.  August 11 statements and the buccal swab.  The defendant contends that the August 11 interview constituted custodial interrogation and therefore Miranda warnings were required and accordingly his statements and the DNA results from his buccal swab should have been suppressed.
     We consider four factors in determining whether a person was in custody:
"(1) the place of the interrogation; (2) whether the officers have conveyed to the person being questioned any belief or opinion that that person is a suspect; (3) the nature of the interrogation, including whether the interview was aggressive or, instead, informal and influenced in its contours by the person being interviewed; and (4) whether, at the time the incriminating statement was made, the person was free to end the interview by leaving the locus of the interrogation or by asking the interrogator to leave, as evidenced by whether the interview terminated with an arrest."
Commonwealth v. Groome, 435 Mass. 201, 211-212 (2001).
     Applying the Groome factors, the motion judge concluded that the August 11 interview was not custodial interrogation.  We agree.  The interview took place in a conference room at the Family Justice Center, which is not a police station and to which Boston police are prohibited by a department rule from bringing suspects.  The police did not yet have probable cause that a crime had occurred, and during the interview Detective Goff told the defendant that the victim "didn't know what happened to her."  The interview was informal and its tone conversational, with the defendant sometimes speaking in long narratives.  The police did not threaten or coerce the defendant in any way.  Detective Goff made clear that the defendant was free to leave the interview at any time, and in fact the defendant did leave afterwards.  We conclude that the August 11 interview was not custodial interrogation.
     As to the buccal swab, Detective Goff told the defendant that he did not have to provide one, and police could not compel him to do so.  When the defendant expressed the concern about DNA testing that "sometimes these things can come out like wrong," Detective Goff told him people could be exonerated by DNA, but "[y]our DNA will either be there because you . . . left some biological evidence on or in [the victim], or it will not."  The defendant argues that Detective Goff "falsely" told the defendant that mistakes do not occur in DNA testing.  The motion judge concluded that Detective Goff's explanation "was factual and largely accurate although it did not address the possibility of cross-contamination."  We agree that any inaccuracy in Detective Goff's explanation of DNA testing did not affect the voluntariness of the defendant's consent to provide the buccal swab.  See Commonwealth v. Santos, 465 Mass. 689, 698 (2013).  See also Commonwealth v. Diaz, 478 Mass. 481, 485-486 n.7 (2017).
     b.  September 24 statements.  i.  Interrogation techniques.  The defendant argues, as he argued in his motion to suppress, that his statements at the September 24 interview were involuntary, and were made "in violation of Miranda," and "without a valid waiver" because police used coercive interrogation techniques.
     The motion judge found, and the defendant acknowledges, that he waived Miranda at the beginning of the September 24 interview.  The defendant argues that his statements were involuntary because Detective Goff "overstated and misstated" the evidence police had by telling the defendant that the DNA test results were "incontrovertible scientific proof."  We agree with the motion judge that the detective's description of the DNA results as "incontrovertible scientific proof," although omitting the possibility of cross-contamination, did not render the defendant's statements involuntary.  See Diaz, 478 Mass. at 485 n.7; Santos, 465 Mass. at 698.
     The defendant also contends that police used a "now or never" interrogation technique that rendered his statements involuntary.  See Commonwealth v. Novo, 442 Mass. 262, 264 & n.2 (2004), S.C., 449 Mass. 84 (2007) (police falsely and repeatedly told defendant that if he did not speak during interview, "a jury's never going to hear a reason").  The video footage of the September 24 interview shows that when asking the defendant to explain why his sperm cells were in the victim's vagina, Detective Goff commented, "This is your one opportunity.  Well, it's really your second opportunity."  The motion judge concluded that Detective Goff's first comment was ambiguous and his words "your second opportunity" seemed to take into account the August 11 interview (or perhaps the September 9 telephone call), giving support to the interpretation that this was the defendant's opportunity to speak to the police.  We agree that the comment did not render the defendant's statements involuntary.  See Commonwealth v. Miller, 486 Mass. 78, 92 (2020) (detective's comment, "[i]t might be your only chance to actually sit and tell us," permissible and not misstatement of law).  The defendant never invoked his right to counsel, or even mentioned that possibility.  Contrast Commonwealth v. Thomas, 469 Mass. 531, 543 (2014) (detective's statement, "[y]ou had your chance, you just lawyered up" improper).
     ii.  Whether the defendant clearly and unambiguously invoked his right to remain silent.  The defendant further argues that during the September 24 interview, he invoked his right to remain silent, but the police failed to honor his invocation.  This argument is premised on the following exchange, which took place about sixteen minutes into the forty-two minute long interview, after Detective Goff said that a DNA report proved that the defendant's sperm cells were in the victim's vagina:
Detective Goff:  "[O]ne of the things that that nurse did was took a swab from inside of [the victim's] vagina . . . And your sperm cells were located there."
Defendant:  "Can I see --"
Detective Goff:  "So how did that happen?"
Defendant:  "Can I see?"
Detective Goff:  "No, you can't right now."
Defendant:  "Then I can't answer any other questions."
Detective Goff:  "What's that?"
Defendant:  "I can't answer any other questions if I don't have any proof that my, my cells were inside of her vagina."
Detective Goff:  "Well, why would I lie?"
Defendant:  "I wasn't saying you were lying."
Detective Goff:  "Why would I make that up?"
Defendant:  "I didn't say you make it up.  I just wanted to see it."  (Emphasis added.)
The defendant persisted in asking to see the "proof," which Detective Goff repeatedly refused to disclose, saying he did not have the DNA report with him, and he would not have applied for the arrest warrant for the defendant unless he had the evidence, which would be produced in court "eventually."[8]
     The defendant acknowledges that his motion to suppress did not claim that he invoked his right to remain silent, and the motion judge did not address the issue.  Even when the motion judge asked defense counsel directly at the evidentiary hearing on what basis he was moving to suppress the September 24 statements, defense counsel confirmed that his challenge was based solely on voluntariness.  The defendant has therefore waived his current argument and cannot raise it for the first time on direct appeal.  See Mass. R. Crim. P. 13 (a) (2), as appearing in 442 Mass. 1516 (2004) ("Grounds not stated which reasonably could have been known at the time a [pretrial] motion is filed shall be deemed to have been waived").  The waiver rule "serves two practical purposes" in the suppression context:  "[i]t alerts the judge and the Commonwealth to the suppression theories at issue, and allows the Commonwealth to limit its evidence to these theories" (quotation and citation omitted).  Commonwealth v. Delossantos, 492 Mass. 242, 248 (2023).  Thus, the Supreme Judicial Court and this court have routinely declined on direct appeal to consider suppression issues that were not raised in the defendant's motion and not addressed by the motion judge.  See Commonwealth v. Silva, 440 Mass. 772, 782 (2004) ("waiver doctrine precludes defendant who did not properly alert motion judge to issue from raising it on appeal").  Accord Commonwealth v. Pina, 406 Mass. 540, 542, cert. denied, 498 U.S. 832 (1990); Commonwealth v. Lett, 393 Mass. 141, 144 (1984); Commonwealth v. Costa, 65 Mass. App. Ct. 227, 232-233 (2005); Commonwealth v. Johnston, 60 Mass. App. Ct. 13, 20-21 (2003).
     The defendant is not without a remedy:  he can raise the waived issue as an ineffective assistance of counsel claim through a motion for new trial.  See Johnston, 60 Mass. App. Ct. at 21 n.8 (because motions for new trial alleging ineffective assistance of counsel "may be brought at any time, the defendant is not without an avenue of relief").  Indeed, cases arising in that procedural context are legion.  See, e.g., Commonwealth v. Wilson, 486 Mass. 328, 337-339 (2020); Commonwealth v. Bennett, 414 Mass. 269, 271 (1993); Commonwealth v. Sorenson, 98 Mass. App. Ct. 789, 791 (2020), cert. denied, 142 S. Ct. 107 (2021).  It is true that, in some cases, courts have reviewed waived suppression claims on direct appeal to conclude that, even overlooking the waiver, the claims were in any event meritless and so did not create a substantial risk of a miscarriage of justice.  See, e.g., Commonwealth v. Dew, 478 Mass. 304, 309-310 (2017); Commonwealth v. Arzola, 470 Mass. 809, 814 (2015), cert. denied, 577 U.S. 1061 (2016).  See also Commonwealth v. Washington, 449 Mass. 476, 483 (2007) (appellate court can affirm denial of motion to suppress on any ground supported by record).[9]  While the Commonwealth urges us to follow that course here, we decline to do so for the following reasons.[10]
     Most fundamentally, resolution of the defendant's claim depends on the development of facts not in the record.  It is, of course, the role of the trial court to find facts.  Had the defendant raised the invocation issue, the Commonwealth could have presented evidence on whether Detective Goff heard the defendant when he said, "Then I can't answer any other questions," and whether Detective Goff's response -- "What's that?" -- was an attempt to clarify what the defendant meant.  See Commonwealth v. Smith, 473 Mass. 798, 808 (2016) ("You're done with what?" appropriate inquiry); Commonwealth v. Bradshaw, 385 Mass. 244, 265 (1982) (after defendant said, "I don't want to talk," officer's question, "And then what?" appropriate where recording showed that volume of defendant's voice dropped).  Although we have listened to the recording and note that the defendant was speaking at a low volume, we hesitate to draw any conclusions whether Detective Goff heard the defendant, where Detective Goff was not asked that question.
     As for the defendant's subsequent statement, "I can't answer any other questions if I don't have any proof that . . . my cells were inside of her vagina," the Commonwealth has a potentially meritorious argument that this was not a clear and unambiguous invocation when considered in light of the entire interview.  It is a defendant's "burden to establish, based on a totality of the circumstances, that his . . . statements purportedly reasserting [his Miranda] right were clear and unambiguous[], such that a reasonable police officer in the circumstances would understand the statement[s] to be an invocation" (quotation and citation omitted).  Commonwealth v. Weidman, 485 Mass. 679, 685 (2020).  If a defendant's purported invocation of his right to remain silent is ambiguous, the police are not required to end the interview or ask clarifying questions.  See Berghuis v. Thompkins, 560 U.S. 370, 381 (2010); Weidman, supra at 686-687.
     Context matters in this analysis.  See Weidman, 485 Mass. at 686; Commonwealth v. Pennellatore, 392 Mass. 382, 387-388 (1984).  Here, the statement in question was preceded by a discussion between the defendant and Detective Goff about the DNA report and whether Detective Goff was lying when he said it showed that the defendant's sperm cells were found in the victim's vagina.  Immediately after making the statement, the defendant continued that discussion with no hesitation.  In these circumstances, a reasonable officer might not have understood the defendant to be invoking his right to remain silent.  See Weidman, supra at 686-687 (defendant's statement, "[I] guess we should stop this conversation because apparently I'm not going to give you the truth," not clear and unambiguous where it was preceded by discussion in which officers expressed belief that defendant was lying and defendant continued talking "without any apparent hesitation" after making statement); Pennellatore, supra at 386-387 ("Can we stop please?" not clear and unambiguous when viewed in light of defendant's "willingness to talk both immediately prior to and subsequent to the break").
     We think it both premature and imprudent, however, to decide this question in the first instance on direct appeal.  As discussed above, whether the defendant's first statement, "Then I can't answer any other questions," was a clear and unambiguous invocation cannot be resolved on this record.  If the defendant prevails on that issue, there will be no need to go further.  As for the defendant's second statement, in which he conditioned his answering "other questions" on being shown "proof" that his "cells were inside of [the victim's] vagina," whether that was a clear and unambiguous invocation should be decided in the first instance by a motion judge.  Cf. Commonwealth v. Howard, 469 Mass. 721, 730 (2014) (based on motion judge's findings, court rejected argument that defendant's Miranda waiver was "conditional rather than unequivocal").  The question is whether a reasonable officer in Detective Goff's position would have heard the defendant's conditional statement as a clear and unambiguous invocation.  See Commonwealth v. Sicari, 434 Mass. 732, 749 n.13 (2021), cert. denied, 534 U.S. 1142 (2002).  Resolving that question may depend not on what can be heard on the audio-video recording now by a listener who can adjust its volume and play it repeatedly, but on evidence such as the volume of the defendant's voice at the time he spoke and whether there were other circumstances bearing on how a reasonable officer would have perceived the statement.  Indeed, it is common in cases involving invocation of Miranda rights for audio-video recorded interviews to be accompanied by testimony from the interviewing officers.  See, e.g., Commonwealth v. Clarke, 461 Mass. 336, 341 (2012).  Put simply, we do not know what evidence the Commonwealth would have offered, or could offer, because it was never on notice of the need to offer any.  See Delossantos, 492 Mass. at 248-249.  See also Johnston, 60 Mass. App. Ct. at 21 n.8 ("Whether the defendant received the functional equivalent of all of the required [Miranda] warnings is, in these circumstances, a question of fact best resolved in a trial court rather than an appellate court").
     Furthermore, to the extent "[t]rial counsel's failure to raise the [invocation] issue may have constituted ineffective assistance of counsel," we likewise cannot decide that claim on this record.  Johnston, 60 Mass. App. Ct. at 21.  Contrary to the dissent's conclusion, the record shows that trial counsel's failure to raise the invocation issue may have been the product of a strategic decision.  While the defendant would have had the burden of proof on the invocation issue, the Commonwealth had the burden of proof of establishing beyond a reasonable doubt that the defendant's confession was voluntary.  See Commonwealth v. Baye, 462 Mass. 246, 256 (2012).  At the suppression hearing, counsel made clear that he was focusing on voluntariness and, in support of that claim, argued that up to the point of the confession "[the defendant] is very much asserting himself.  He's asking questions.  He's trying to understand what he has a right to see and what he doesn't have a right to see."[11]  Counsel then compared that assertive behavior to the defendant's demeanor after Detective Goff told him he had "one opportunity" to speak -- noting that the difference was "really stark" and "[spoke] volumes about the voluntariness" -- while stressing that the Commonwealth had the burden of proof beyond a reasonable doubt.  These arguments suggest that counsel might have made a strategic choice to forgo any claim that the defendant invoked his right to remain silent, in light of the differing burdens of proof and that such a claim would have contradicted counsel's theory of involuntariness.  These issues may be probed further through a motion for new trial.  See Bennett, 414 Mass. at 271 (trial judge did not err in rejecting ineffective assistance claim where defendant failed to show counsel acted unreasonably in failing to move to suppress); Johnston, supra at 21 n.8 (whether counsel made tactical choice not to raise issue in motion to suppress "appropriately fleshed out in a motion for new trial").
     Finally, the course of action we take would give the trial judge, who heard four days of testimony, the opportunity to decide in the first instance whether any tainted evidence created a substantial risk of a miscarriage of justice.  In this regard, we note that, while the defendant's confession was obviously damaging to his defense, the Commonwealth presented strong additional evidence of the victim's incapacitation.  This evidence included the defendant's admissions in the August 11 interview that the victim was so drunk he could not wake her and that she was still drunk when she woke up in the morning; his admissions in the September 24 interview, made prior to the statements he now claims were invocations, that the victim was "very drunk" to the point where she fell asleep and did not wake up until the morning; testimony that the defendant sought help from a university police officer because there was a "really drunk" girl in his car; the defendant's text messages to the victim in which he stated that she had "passed out" and he tried to wake her but "that wasn't possible at all"; and the defendant's text messages to his friend in which he stated that he had tried to wake the victim several times.  We further note that the trial judge gave a humane practice instruction when each of the defendant's statements was admitted and again in her final charge.  In any event, whether the circumstances in their totality gave rise to a substantial risk of a miscarriage of justice can be probed through a motion for new trial.  See Wilson, 486 Mass. at 339.
     2.  Testimony that the victim reported she lost consciousness.  The defendant argues that the testimony of the SANE nurse that the victim experienced "loss of consciousness" amounted to an improper expert opinion.  The defendant did not object to the testimony or to the jury instruction on expert testimony, and so we consider the issue to determine if any error created a substantial risk of a miscarriage of justice.  See Commonwealth v. McCoy, 456 Mass. 838, 850 (2010).
     The SANE nurse testified that on Form 2B from the evidence collection kit, under the section entitled "Acts Described by the Patient," she checked the box next to "Yes" in response to the question, "Was there loss of consciousness?" and wrote, "pt does not have any memory from ~1:45 A.M. on 7/31 -> ~7:00 A.M."  The SANE nurse explained that as a result of that lack of memory, samples were collected from all areas of the victim's body.  The SANE nurse made clear that the information that the victim had lost consciousness was based on the victim's own report; the SANE nurse never testified that she believed the victim lost consciousness.  In closing, defense counsel argued that the SANE nurse "basically recorded what she was told.  I don't think she made any real expert opinions."
     There was no error, and thus no substantial risk of a miscarriage of justice, because the victim's statements to the SANE nurse that she had no memory of events during that time period were made for the purposes of obtaining medical treatment, see G. L. c. 233, § 79.  "[T]hese statements were thus admissible even though 'incidental to liability.'"  Commonwealth v. Dargon, 457 Mass. 387, 396 (2010), quoting Commonwealth v. DiMonte, 427 Mass. 233, 242 (1998).  See Commonwealth v. Hoime, 100 Mass. App. Ct. 266, 275 (2021).  Because the SANE nurse did not testify to any expert opinion, no substantial risk of a miscarriage of justice arose when the trial judge omitted her name from the list of witnesses to whom the jury instruction on experts pertained.
     3.  Exclusion of inconclusive DNA evidence.  Before trial, the defendant moved in limine to introduce evidence of the victim's prior sexual conduct under the rape shield statute, G. L. c. 233, § 21B.  The trial judge denied the motion during trial.  The defendant contends that the ruling was prejudicial error.
     We review the trial judge's evidentiary ruling for an abuse of discretion, reversing only if she made "a clear error of judgment in weighing the factors relevant to the decision, such that the decision falls outside the range of reasonable alternatives" (quotation and citation omitted).  L.L. v. Commonwealth, 470 Mass. 169, 185 n.27 (2014).  See Commonwealth v. Denton, 477 Mass. 248, 250 (2017).  We accord "substantial deference" to a trial judge's decision to admit or exclude evidence, including DNA evidence, based on whether it "is relevant, and if so, whether it nevertheless should be excluded as less probative than prejudicial."  Commonwealth v. Mattei, 455 Mass. 840, 850 (2010).  "As the proponent of the evidence, the defendant had the burden of proving admissibility."  Commonwealth v. Chilcoff, 103 Mass. App. Ct. 48, 56 (2023).
     During a voir dire outside the presence of the jury, the DNA analyst explained that the vaginal swab from the victim contained a mixture that included a major contributor as well as "DNA characteristics" of two or more other males.  The portion from the major contributor was substantially larger, was the only portion suitable for comparison testing, and matched the defendant's known sample.  The portions that were possible DNA characteristics of other males were not suitable for testing and might not actually be DNA characteristics of other males but merely artifacts that are a byproduct of the process used to amplify DNA.  See Commonwealth v. DiCicco, 470 Mass. 720, 728 & n.17 (2015).  Given the small amount of the portion of possible DNA characteristics, the analyst could not determine if it was consistent with the victim's having had intercourse with men other than the defendant, or when any such intercourse would have occurred.  Based on that voir dire and defense counsel's representation that the defendant would testify that he and the victim had consensual sex,[12] the trial judge ruled that the DNA analyst's testimony about possible DNA characteristics of other males was not relevant, was not probative of whether the victim consented to sex with the defendant or had the capacity to consent, and its prejudicial impact was "extraordinarily great," outweighing any probative value.
     We discern no abuse of discretion in the trial judge's ruling.  The evidence of possible DNA characteristics of other males was not relevant.  That evidence had "no effect" on the DNA analyst's opinion about the DNA in the portion from the major contributor and no relevance to the issue of consent.  Commonwealth v. Gaynor, 443 Mass. 245, 265 (2005) ("a weak reading of a secondary contributor or technical artifact had no effect on [the analyst]'s ability to report the result of the primary contributor and calculate a statistic of the probability of a random match to the defendant's DNA profile").  At the same time, the prejudicial impact would have been great.  See Chilcoff, 103 Mass. App. Ct. at 56 (prejudice outweighed probative value of evidence of DNA in sperm found on victim's underpants five days after rape, absent proof that she wore those underpants at time of rape).
     4.  Closing argument.  The defendant argues that the prosecutor improperly argued in closing that the defendant's text messages to the victim showed that he had a "guilty conscience," and that he considered the victim someone he could "exploit."  The defendant did not object to the closing argument, and so we review it to determine whether any error created a substantial risk of a miscarriage of justice.  See Commonwealth v. Kozubal, 488 Mass. 575, 590 (2021), cert. denied, 142 S. Ct. 2723 (2022).
     The prosecutor argued in closing that the defendant sent text messages to the victim "acting like he's concerned for her, just wants to check in on her," but "[t]he evidence suggests that he did this perhaps to keep tabs on what she might remember once she sobered up," "[a]nd those text messages display his guilty conscience."  We read those comments as permissible inferences from the evidence.  See Commonwealth v. Carriere, 470 Mass. 1, 22 (2014).
     From the defendant's text messages to his friend, the prosecutor argued that "he felt he could laugh at and exploit [the victim] while she was in this vulnerable state."  That, too, was a permissible argument based on the evidence.  See Commonwealth v. Crouse, 447 Mass. 558, 576 (2006).  "Statements by a prosecutor in . . . her . . . closing argument must be fair, but, so long as the remarks are fair, they can be tough."  Id.
     Moreover, the trial judge instructed at least three times that closing arguments are not evidence.  We discern no substantial risk of a miscarriage of justice.
Judgment affirmed.
     SMYTH, J. (dissenting).  The court's decision essentially forecloses a defendant in a noncapital case from obtaining relief based on a meritorious waived claim related to a suppression issue by, first, elevating the standard of eligibility for such review, and second, positing that such review is permissible only if the underlying conviction remains undisturbed.  As to whether the defendant's invocation claim is ripe for our review, I disagree with the court's determination that the record in this case is inadequate to permit our review of the defendant's claim that the interrogating detectives failed to honor the defendant's invocation of his right to remain silent.  Ante at   .  The record, consisting of the audio-video recording and transcript of the defendant's September 24 interrogation, allows for our de novo review to determine if the defendant met his burden of establishing whether a reasonable detective would have understood the defendant's statements as an invocation of his right to remain silent.  Because the record is adequate, and, considering that the parties fully briefed and argued this issue on appeal, we should exercise our authority to review the defendant's claim for a substantial risk of a miscarriage of justice.  In addition, the defendant here should be afforded such review irrespective of whether it ultimately leads to a different outcome than the one reached in the trial court.
     On the merits of the defendant's claim of error, I conclude that the detectives failed to scrupulously honor the defendant's clear and unambiguous invocation of his right to remain silent.  The erroneous admission of the defendant's confession was likely devastating to the case against him, and as such, created a substantial risk of a miscarriage of justice.
     I also disagree that the defendant's confession was voluntary.  The detective improperly coerced the defendant's confession by denying the defendant's request to stop the interrogation, and instead, by ratcheting up the pressure on the defendant with continued questioning and by extending a prohibited "last chance to confess" opportunity to the defendant Accordingly, I would vacate the conviction and remand for a new trial.
     1.  The court's discretionary authority to review a waived claim.  a.  Noncompliance with Mass. R. Crim. P. 13 (a) (2).  Although I agree with the court that the defendant waived his claim of invocation by not raising it in his motion to suppress, the defendant's procedural shortcoming should not end our review.  The Supreme Judicial Court has emphasized that a critical purpose of a party's compliance with the particularity requirement of Mass. R. Crim. P. 13 (a) (2), as appearing in 442 Mass. 1516 (2004) (rule 13 [a] [2]), is fair notice to the other party.  See Commonwealth v. Delossantos, 492 Mass. 242, 248-249 (2023).  Accordingly, our courts have demonstrated a reluctance to review a newly raised claim where a party asserts it would be prejudiced by such review.  See Commonwealth v. Bettencourt, 447 Mass. 631, 634 (2006) (Supreme Judicial Court declined review of Commonwealth's newly raised claim in part because defendant had no opportunity to oppose it at suppression hearing); Commonwealth v. Pares-Ramirez, 400 Mass. 604, 609 (1987) (court refused to review new claim due to concerns including Commonwealth's objection and unfair prejudice to Commonwealth).  See also Commonwealth v. Quint Q., 84 Mass. App. Ct. 507, 513-515 (2013) (judge erred in suppressing juvenile's statement where Commonwealth was prejudiced by judge ruling on theory not presented in motion to suppress or at suppression hearing).  The Commonwealth has claimed no such prejudice in this case due to the defendant's failure to comply with rule 13 (a) (2).  Yet, even in light of the Commonwealth's concession that noncompliance with rule 13 (a) (2) should not preclude review of the defendant's newly raised claim, this court takes it upon itself to deny review of the claim's merits on this procedural ground.  By declining to review the defendant's claim, the court has elevated a procedural requirement above the defendant's constitutional rights and the risk that his conviction amounts to a miscarriage of justice.  See Hormel v. Helvering, 312 U.S. 552, 557 (1941) ("Rules of practice and procedure are devised to promote the ends of justice, not to defeat them").
     b.  Adequacy of the record for review.  Instead of declining to review the defendant's waived claim, our longstanding precedent instructs that we have the discretion to review the claim for a substantial risk of a miscarriage of justice.  See, e.g., Commonwealth v. Dew, 478 Mass. 304, 309-310 (2017) ("Because the defendant did not raise [suggestiveness of showup identification] before the motion judge, he has waived the argument. . ?. ?.  We nonetheless review to determine whether there was a substantial risk of a miscarriage of justice"); Commonwealth v. Arzola, 470 Mass. 809, 814 (2015), cert. denied, 577 U.S. 1061 (2016); Commonwealth v. Garcia, 409 Mass. 675, 678–679 (1991); Commonwealth v. Scala, 380 Mass. 500, 510 (1980).  Relevant factors weighing in favor of reaching the merits are whether the record is adequate for a review, and whether the parties fully briefed the matter.  See Arzola, supra (record from hearing concerning other suppression claims proved adequate for court to review merits of newly raised claim that deoxyribonucleic acid [DNA] analysis of defendant's bloodstained shirt constituted search that required warrant).  See also Dew, supra (record from hearing on suggestiveness of identification claim was adequate to allow court to decide newly raised claim concerning identification).
     I disagree with the court's determination that the record in this case is inadequate to support review of the defendant's claim.  In order to review this claim of invocation, it is necessary to determine whether the defendant met his burden of establishing that a reasonable detective would have concluded that the defendant made a clear and unambiguous invocation.[1]  Considering that the defendant's statements of invocation and the detective's response have been preserved in the audio-video recording, and transcribed without dispute, there is no impediment to our de novo review concerning the clear meaning of the defendant's statements as well as whether the detective's responses to the statements were objectively reasonable.  There are no facts left to resolve; nor are any determinations of credibility necessary to our inquiry.
     In fact, our discretionary review of this invocation claim would be quite similar to that undertaken by the court in Commonwealth v. Smith, 473 Mass. 798, 803 n.10 (2016).[2]  In that case, the court concluded that the audio-video recording and transcript of the defendant's interrogation provided an adequate record to reach the defendant's newly raised claim that his inculpatory statements had been obtained illegally after he invoked his right to remain silent.  See id. at 804, 811-813.  See also Commonwealth v. Weidman, 485 Mass. 679, 689-690 (2020) (court, as part of ordinary, nonstatutory review, determined merits of defendant's Miranda waiver and voluntariness claims "[b]ased on [its] review of both the transcript and the recording of the defendant's interview").
     Notably, the Commonwealth in its brief does not claim it would be prejudiced by our review of the existing record to determine whether the defendant invoked his Miranda rights.  To the contrary, the Commonwealth fully briefed the issue and expressly invited this court to review the defendant's claim under the substantial risk of a miscarriage of justice standard.[3]
     The parties' agreement about the adequacy of the record is not surprising given that the nature of the record in our case is clearly distinguishable from cases in which our court has concluded the record to be inadequate for review.  For example, in Commonwealth v. Santos, 95 Mass. App. Ct. 791, 797-798 (2019), the court found the record was inadequate to permit a review of the defendant's newly raised suppression claim regarding whether the officer's investigative stop of the defendant's vehicle was supported by reasonable suspicion because there was no evidence presented in the trial court on the issue.  The court concluded that "[i]n these circumstances, the correct result on appeal is to decline to reach the merits of the issue raised for the first time on appeal because it depends on the development of facts not in the record before us."  Id. at 798.  See Garcia, 409 Mass. at 679 (court refused to decide claim raised for first time on appeal because "[t]he parties failed to develop any evidence on the issue of the propriety of the impoundment of the vehicle, either at the suppression hearing or at trial"); Commonwealth v. Brule, 98 Mass. App. Ct. 89, 92 (2020) (record inadequate to review newly raised claim of whether officer conducted unlawful search where circumstances of patfrisk were not developed in trial court); Quint Q., 84 Mass. App. Ct. at 513-515 (trial court judge erred in allowing motion to suppress on ground not raised by defendant, where Commonwealth was not on notice of need to present evidence to prove juvenile's mother was interested adult whose conduct was not coercive).
     Here, in contrast, the defendant's challenge to the voluntariness of his confession developed and preserved the required evidence relating to the detective's response to the defendant's attempt to stop the interrogation, and it is unnecessary for the Superior Court to make further findings to address the reasons the court offers for its inadequacy determination.  See ante      .  First, it is unnecessary for the motion judge to resolve whether the detective heard the defendant's first statement of invocation in determining whether he made a valid invocation because it is clear from the record -- and the Commonwealth concedes in its brief -- that the detective heard and responded to this statement.[4]
     Moreover, even if we were to grant that the detective did not hear the first statement of invocation, there is no dispute the detective heard the defendant's second statement, "I can't answer any other questions if I don't have any proof that my, my cells were inside of her vagina."  As discussed below, the second statement alone established the defendant's clear and unambiguous request to stop the interrogation.
     Second, it is irrelevant how Detective Goff perceived the defendant's second statement because our review is from the perspective of the reasonable detective, see infra at      .  See Commonwealth v. Clarke, 461 Mass. 336, 342 (2012).  The interrogation is preserved for our de novo review as to whether a reasonable detective would have understood the defendant's statements to constitute an invocation.  This is a question we can readily answer based on the record before us.
     Furthermore, although the question whether the detective made false claims about the content of the DNA report may have been relevant to the defendant's involuntariness claim, as argued by the motion counsel, that particular argument is irrelevant to the determination of whether the defendant unambiguously communicated his right to remain silent; thus, no further facts need to be resolved.[5]
     Finally, the invocation issue is so closely related to the defendant's voluntariness challenge, which was litigated in the Superior Court, that it could reasonably be considered an extension of that argument.  See Commonwealth v. Yasin, 483 Mass. 343, 349-350 (2019); Dew, 478 Mass. at 308–310 (defendant's general claim of suggestiveness as basis to suppress identification sufficiently preserved record for court to consider new claim on appeal concerning improper police conduct infecting identification procedure).  In fact, the defendant's voluntariness argument was premised on the detective's refusal to meet the condition upon which the defendant's invocation was based:  his request to see the DNA evidence that implicated him.  The defendant's motion counsel argued that the defendant "immediately shifted and made the first admission that sort of led to the confession" only after the detective denied the defendant's request to see the DNA evidence and insisted that the defendant had "one opportunity to tell his story."
     By elevating the standard for the adequacy of the record required for review, the court's decision will effectively deny review to defendants who otherwise would have been eligible to seek relief of a claim first raised on direct appeal.  Instead, the court concludes that the defendant's only course of remedy is to seek relief through the filing of a motion for a new trial based on ineffective assistance of counsel.  See ante at      .  However, in providing a roadmap for the defendant to seek relief in the Superior Court, the court does not acknowledge the costs and challenges inherent in this approach.[6]  In some instances, such as the one presented here, justice is best served by resolving such claims as expeditiously as possible regardless of the outcome of such review.
     I turn now to the merits of the defendant's claim of invocation.
     2.  Invocation of the right to remain silent.  a.  Invocation.  In its seminal decision in Miranda v. Arizona, 384 U.S. 436, 473-474 (1966), the United States Supreme Court intentionally set a low bar for the invocation of the right to remain silent:  "If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease."  See Clarke, 461 Mass. at 342.  The constitutionally based prophylactic rule announced in Miranda protects rights guaranteed under both the Fifth Amendment to the United States Constitution[7] and art. 12 of the Massachusetts Declaration of Rights.[8]  Commonwealth v. Martin, 444 Mass. 213, 218 (2005).  An individual need not persuade the interrogator in order to invoke the right to remain silent, or even provide a reason; the individual needs merely to unambiguously express a desire to remain silent.  See Clarke, supra.  The test of whether a defendant has invoked the right to remain silent "is an objective one, requiring 'that a reasonable police officer in the circumstances would understand the statement' to be an invocation of the Miranda right."  Id., quoting Davis v. United States, 512 U.S. 452, 459 (1994).
     The defendant here clearly and unambiguously invoked his right to remain silent when he stated, "I can't answer any other questions if I don't have any proof that my, my cells were inside of her vagina."  The simple and unequivocal meaning of this statement in the context it was made conveys clear expression of the defendant's unwillingness to continue being subject to interrogation, see Smith, 473 Mass. at 808 n.15;[9] a reasonable detective in the circumstances would have understood the statement as such.[10]  See id. at 808 ("I'm done talking.  I don't wanna talk no more," was invocation); Commonwealth v. Hearns, 467 Mass. 707, 717 (2014) ("Well then, I don't want to talk.  I haven't got nothing to say," was invocation); Commonwealth v. Santana, 465 Mass. 270, 282 (2013) (defendant's statement that he "couldn't say any more" was invocation); Commonwealth v. Santos, 463 Mass. 273, 285 (2012) ("I'm not going on with this conversation," was invocation).
     The defendant's statement is distinguishable from the range of statements the Supreme Judicial Court has concluded to be insufficiently clear expressions of invocation.  For example, in Weidman, 485 Mass. at 685, the court considered the defendant's statement, "I'm not going to keep answering the same questions" (emphasis added).  The court concluded that statement did not amount to an invocation because a reasonable officer would have understood the statement in the context of the interview to be an expression of the clearly "agitated" defendant's frustration with the repetitive nature of the questioning, rather than an "expressed refusal to answer further questions."  Id.  See Commonwealth v. Robidoux, 450 Mass. 144, 160 (2007) (defendant's statements, "I will not talk about my family," was not invocation of right to remain silent in light of defendant's willingness to discuss other matters); Commonwealth v. Leahy, 445 Mass. 481, 488-489 (2005) (defendant's statement, "Not right now, in a minute.  I need to figure some things out," in response to request to resume interview was not unambiguous invocation).
     Moreover, the fact that the defendant placed a contingency on his willingness to answer questions -- namely, the opportunity to see the "incontrovertible scientific proof" of his guilt -- did not render the invocation ambiguous.  The Supreme Judicial Court's opinion in Hearns, 467 Mass. at 717-718, is instructive on this issue, as both the context surrounding the statements and the condition included in the invocation closely resemble those present in this case.  In Hearns, the defendant waived his Miranda rights before asking the detective to share details of the case against him.  See id. at 712.  When the detective refused to do so, the defendant then conditioned his continued waiver of rights by stating, "Well then, I don't want to talk.  I haven't got nothing to say."  Id.  The court held that the defendant's stated unwillingness to continue speaking due to the police's refusal to meet his condition constituted an unambiguous invocation.  See id. at 717-719.  In reaching its decision, the court explicitly concluded that the contingent nature of the defendant's statement did not render it ambiguous.  See id. at 719 & n.16.  See also Commonwealth v. Bins, 465 Mass. 348, 361-362 (2013) (defendant's statement of "[T]oday, no," constituted unambiguous invocation conditioned on detective's reapproaching defendant only after sufficient time elapsed); Smith v. Endell, 860 F.2d 1528, 1531–1532 (9th Cir. 1988), cert. denied, 498 U.S. 981 (1990) (detainee's request for attorney conditioned on his status as suspect in murder investigation constituted unambiguous invocation).  Cf. Santos, 463 Mass. at 285 (defendant's statement of reason why he invoked right to counsel does not render request ambiguous).  While the defendant in this case had no right to see the DNA report during his interrogation, he did have the right to condition his waiver of Miranda on the ability to review it.  See Hearns, supra.
     Notably, the defendant made the statement at issue immediately after being confronted with what the detective represented as "incontrovertible scientific proof" that his sperm had been recovered from the victim's vagina.  The detective's mention of the DNA evidence and his refusal to produce the report caused the defendant to attempt to abruptly end the interrogation so that he would not be compelled to offer incriminating information against himself.  The defendant's right to do so is protected under both the Fifth Amendment and art. 12.
     Even assuming arguendo that the detective was uncertain of the scope of the defendant's invocation, the detective was still required to cease interrogating the defendant about the rape and was entitled only to a limited inquiry to attempt to clarify the defendant's intent.  See Santos, 463 Mass. at 286 (interrogating detective must cease interrogation if there is reasonable uncertainty as to nature of defendant's invocation; any question clarifying invocation "should be brief, worded only to elicit an affirmative or negative response . . . and should not be designed to keep the suspect talking").  See, e.g., Smith, 473 Mass. at 808 (detective's question, "You're done with what?" was appropriate effort to clarify defendant's statement "I'm done").  Here, the experienced detective did not attempt to resolve any ambiguity in the invocation after the defendant stated that he could not answer any other questions;[11] rather, the detective sought only to convince the defendant to continue speaking about the crime charged until the defendant relented and confessed.  This was improper.  See Santos, supra at 286-287 (defendant's statements made after officer exceeded scope of clarifying defendant's invocation by attempting to elicit further statements should have been suppressed).
     b.  Postinvocation questioning.  Because the defendant invoked his right to remain silent under Miranda, the admission of any statements that followed his invocation depends on whether his "right to cut off questioning" was "scrupulously honored" (citation omitted).  Michigan v. Mosley, 423 U.S. 96, 104 (1975) (Mosley).[12]  See Clarke, 461 Mass. at 344.  Once the defendant repeated that he could not answer any other questions and conditioned his silence on seeing proof that his sperm was recovered from the victim's vagina, the detective had two options under Mosley:  immediately stop the interrogation or suspend the interrogation until complying with the defendant's request to see the evidence before resuming with his questioning.  See, e.g., Bins, 465 Mass. at 361 (following defendant's invocation of "[T]oday, no," detective properly waited nine hours before reapproaching defendant).
     The detective chose neither option.  Undeterred by the defendant's invocation, the detective instead attempted to persuade the defendant to change his mind about his decision to stop answering questions by advising the defendant that "you're focusing on the wrong thing," "[y]ou don't need to see the proof," and by asking the defendant to take his word that such proof exists.  The detective insistently told the defendant to "[e]xplain how your sperm cells got in her vagina," while also resorting to the "Why would I lie?" interrogation deflection tactic.  By continuing with his interrogation in this manner, the detective failed to "scrupulously honor[,]" (citation omitted), Mosley, 423 U.S. at 104, the defendant's invocation of his right to silence, and consequently, the statements following the defendant's invocation were obtained in violation of Miranda.  See Smith, 473 Mass. at 810; Commonwealth v. Thomas, 469 Mass. 531, 541-543 (2014); Hearns, 467 Mass. at 719.
     The Commonwealth's contention that the defendant's invocation may be rendered ambiguous, because he continued to respond to the detective's questions after he stated he could not do so, ignores "the long-standing principle that 'postrequest responses to further interrogation may not be used to cast retrospective doubt on the clarity of the initial request itself.'"  Commonwealth v. Hoyt, 461 Mass. 143, 152 (2011), quoting Smith v. Illinois, 469 U.S. 91, 100 (1984).  See Smith, supra at 98–99 ("Using an accused's subsequent responses to cast doubt on the adequacy of the initial request [for counsel] itself is . . . intolerable").  That the defendant continued to respond to the detective's questions after stating he could not answer any more questions would be relevant only as to whether he subsequently waived his invocation, an issue which is not before us.[13]  See id. at 98.
     The court's reliance on Weidman, 485 Mass. at 686, in arguing the relevance of the defendant's contextual postinvocation responses is similarly misplaced.  Ante at      .  Unlike in the present case, the defendant in Weidman never "'manifest[ed] an expressed unwillingness to continue with the interview' as a whole" (citation omitted).  Id.  Instead, Weidman first stated his reluctance to answer certain questions, and then responded to accusations that he was lying with the "exasperated, sarcastic remark, 'Oh, okay, then [I] guess we should stop this conversation because apparently I'm not going to give you the truth.'"  Id.  In the context of that interrogation, the court concluded the defendant's statements were not a clear invocation.  See id. at 686-687.
     By contrast, the defendant in this case stated, "I can't answer any other questions if I don't have any proof that my, my cells were inside of her vagina."[14]  Because nothing about the defendant's expression to stop answering questions or the circumstances leading up to the request would render it ambiguous, the detective was required to either stop asking the defendant questions and pressing the evidence against the defendant in effort to elicit further statements from him or show the report to the defendant.  See Smith, 473 Mass. at 810; Hearns, 467 Mass. at 718; Santos, 463 Mass. at 287.  Indeed, as the United States Supreme Court has explained,
"No authority, and no logic, permits the interrogator to proceed . . . on his own terms and as if the defendant had requested nothing, in the hope that the defendant might be induced to say something casting retrospective doubt on his initial statement that he wished to speak through an attorney or not at all" (citation omitted).
Smith, 469 U.S. at 99.
     Accordingly, the statements the detective elicited after the defendant invoked his right to remain silent were obtained in violation of the defendant's rights under both the Fifth Amendment and art. 12 and should not have been admitted at trial.
     3.  Voluntariness of the defendant's confession.  I also conclude that the Commonwealth failed to meet its "heavy burden" of proving beyond a reasonable doubt the confession was a product of the defendant's rational intellect and free will in light of the totality of the circumstances (citation omitted).  Commonwealth v. Baye, 462 Mass. 246, 256 (2012).
     The detective significantly increased the coercive effect of his interrogation by ignoring the defendant's attempt to avail himself of the right to remain silent.  Cf. Baye, 462 Mass. at 263 (where the police "ignore the defendant's attempts to avail himself of those [precustodial Miranda] rights, the coercive effect of continued interrogation [is] greatly increased because the suspect [could] believe that the police 'promises' to provide the suspect's constitutional rights were untrustworthy, and that the police would continue to ignore subsequent invocations, rendering such invocations futile" [quotation and citation omitted]).  Considering the detective's relentless questioning and repeated assurances that the defendant did not need to see the evidence against him, the defendant may have reasonably concluded that it was futile to resist by remaining silent.[15]  See id.
     Furthermore, the detective exacerbated the coercive nature of the interview by advising the defendant, within a few minutes of the defendant's invocation, that the interrogation presented the defendant's "one opportunity" (then clarified to be his "second opportunity") to tell his side of the story.  The Supreme Judicial Court has determined statements of this "now or never" variety to be misleading, improperly coercive, and violative of Miranda, when expressed following a defendant's invocation of the right to counsel.  See Thomas, 469 Mass. at 542-543.  "Now or never" type statements following an invocation unfairly sow confusion and pressure defendants to choose between either seeking protection guaranteed by a constitutional right or taking the one, and seemingly final, opportunity to tell their side of the story.  See id.
     Moreover, the indisputable direct causation between the detective's conduct and the defendant's confession is significant to the voluntariness determination.  Cf. Commonwealth v. Durand, 457 Mass. 574, 596-597 (2010), S.C., 475 Mass. 657 (2016), cert. denied, 583 U.S. 896 (2017) (suppression not required where "the incriminating statements made by the defendant were not tied to or otherwise made in response to the pressure tactics employed by the officers").  The defendant's confession occurred less than four minutes after the detective's failure to honor the defendant's statement that he could not answer any other questions, and immediately followed the detective's statement to the defendant that this was his "one chance" to explain the presence of his sperm cells in the victim's vagina.
     Finally, although the trial judge gave a version of the humane practice instruction to the jury before the audio-video recording of the defendant's confession was played for the jury, and again during final instruction, on neither occasion did the judge specifically instruct the jury that the defendant, following waiver of Miranda rights, had the right to invoke his right to silence.  In fact, the judge denied the defendant's request to instruct the jury that, in considering whether the Commonwealth had met its burden of proving voluntariness, the defendant had the right to stop the interrogation at any time.   Thus, I conclude that the Commonwealth failed to meet its heavy burden of proving voluntariness.
     4.  Prejudice to the defendant.  Considering that the detective did not "scrupulously honor" the defendant's invocation of his right to stop the interrogation, it is necessary to determine whether the admission of the defendant's invocation and confession in violation of Miranda created a substantial risk of a miscarriage of justice.  Although the Commonwealth concedes the defendant's confession constituted "substantial admissions to the crime," it argues that any potential error did not amount to substantial risk of a miscarriage of justice.  I disagree.
     "The substantial risk standard requires us to determine 'if we have a serious doubt whether the result of the trial might have been different had the error not been made'" (citation omitted).  Commonwealth v. Azar, 435 Mass. 675, 687 (2002), S.C., 444 Mass. 72 (2005).  In conducting this analysis, we are guided by four factors:  "[(1)] the strength of the Commonwealth's case, [(2)] the nature of the error, [(3)] the significance of the error in the context of the trial, and [(4)] the possibility that the absence of an objection was the result of a reasonable tactical decision"[16] (citation omitted).  Commonwealth v. Desiderio, 491 Mass. 809, 816 (2023).
     Here, the defendant made a full confession to the crime for which he was convicted.  Specifically, he stated that "I, I stick my penis in her vagina."  He described how he opened the victim's legs and penetrated her vagina with his penis as "[s]he was just laying there . . . [s]ort of [asleep]," and "passed out."  Specific to the issue of consent, the defendant admitted that the victim was probably unaware of what he was doing to her.  When the detective asked him, "Did she want you to do that?" the defendant responded, "No."  Finally, when the detective asked the defendant, "You raped her.  Do you understand that?" the defendant responded "Yeah."[17]
     The admission of the defendant's complete confession was devastating to the defendant.  As the Supreme Court stated in Arizona v. Fulminante, 499 U.S. 279, 296 (1991) (Fulminante):
"A confession is like no other evidence.  Indeed, 'the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him. . . .  The admissions of a defendant come from the actor himself, the most knowledgeable and unimpeachable source of information about his past conduct.  Certainly, confessions have profound impact on the jury, so much so that we may justifiably doubt its ability to put them out of mind even if told to do so.'  While some statements by a defendant may concern isolated aspects of the crime or may be incriminating only when linked to other evidence, a full confession in which the defendant discloses the motive for and means of the crime may tempt the jury to rely upon that evidence alone in reaching its decision."  (Citations omitted.)
If we were to remove the defendant's confession from the jury's consideration, the Commonwealth's case against the defendant would depend largely upon circumstantial evidence of the victim's inability to provide consent and the defendant's inconsistent versions of what occurred.[18]  To prove the victim was so impaired as unable to consent, the Commonwealth relied on accounts from the victim, her friend, and a Harvard University police officer.[19]  The jury would likely have weighed this evidence against the defendant's testimony that he had consensual sex with the victim.
     In his defense, the defendant testified that he initially denied having consensual sex with the victim because he feared such an admission would lead to the police arresting and detaining him.  The defendant's fear of the police was born out of his experience growing up in Haiti.[20]  The defendant also explained how he was reluctant to admit to having consensual sex with the victim because she had told him via text message that she had no memory of the sex.  Considering this context, the jury, relying on their collective common sense and life experiences in evaluating the defendant's credibility, may have considered whether it was not beyond the range of reasonable reactions for a young Black man, when accused by the police, to deny having sexual intercourse with a white woman who claimed no memory of the sexual encounter.  There is a significant risk that the jury never entertained this depth of deliberation given the profound impact the admission of the defendant's confession had on their deliberations.  See Fulminante, 499 U.S. at 296.
     The defendant also argued that the Commonwealth's forensic evidence undermined the victim's account of her inebriated state, which had allegedly negated her ability to consent.  Hilary Griffiths, a forensic scientist employed in the toxicology unit of the Massachusetts State police crime laboratory, testified, inter alia, that while evidence of alcohol can be detected in an individual's urine for up to seventy-two hours after consumption, the victim's urine -- the sample of which was obtained approximately twenty-four hours after the victim entered the defendant's vehicle -- tested negative for alcohol.  Again, the jury may have attributed more weight to this evidence as it related to the victim's state of mind in the absence of the defendant's confession to raping the victim.
     The fact that the defendant's confession was not properly excluded may have also adversely impacted the defendant's ability to present a defense "showing potential third party conduct and relate[d] to possible sexual conduct that might explain the medical conditions of the Complainant."  The defendant moved pretrial to admit DNA evidence, through the testimony of Dr. Steven Laken,[21] that demonstrated there were at least three contributors to the semen sample obtained from the victim's vagina.  The defendant argued this was relevant to explain that the victim's physical symptoms that led her to seek medical attention may have been "caused by another person, rather than [the defendant]."  In opposition to the motion, the prosecutor stated, in part, "Even if there were three contributors, there's one [the defendant] who admitted to raping the alleged victim.  And that's the one whose DNA is linked to the sperm found in her vagina."  In denying the defendant's motion, the trial judge stated generally that she agreed with the Commonwealth's reasons for excluding the evidence, and it is unclear from the record how much weight, if any, the judge placed on the defendant's confession in denying the defendant's motion to admit this evidence.  While the circumstances here do not present for a traditional fruit of the poisonous tree analysis, due process principles entitle the defendant to a determination of whether the denial of his motion was due to either the exploitation of the unlawfully obtained confession, or instead, reasons sufficiently distinguishable from it.  See Commonwealth v. Damiano, 444 Mass. 444, 453 (2005) (in determining whether evidence obtained following unconstitutional search or seizure must be suppressed, the issue for the court is "whether . . . the evidence . . . has been come at by exploitation of [that] illegality or instead by means sufficiently distinguishable to be purged of the primary taint" [citation omitted]).
     Considering the strength of the Commonwealth's case, I am persuaded that the admission of the defendant's confession to rape would have had a profound effect on the jury,[22] and would have materially affected their deliberations.  See, e.g., Commonwealth v. Garcia, 476 Mass. 822, 827 (2017) (erroneous admission of witness's testimony concerning defendant's confession "materially influenc[ed] the guilty verdict,"  creating a substantial risk of a miscarriage of justice" [quotation and citation omitted]); Smith, 473 Mass. at 811-813 (erroneous admission of defendant's statement was likely to have affected jury's verdict and thus gave rise to substantial likelihood of miscarriage of justice); Commonwealth v. Tavares, 385 Mass. 140, 152, cert. denied, 457 U.S. 1137 (1982) ("a defendant's statement is usually 'the key item in the proof of guilt, and certainly one of overpowering weight with the jury'" [citation omitted]); Commonwealth v. Harris, 371 Mass. 462, 471–472 (1976) ("in light of the powerful probative effect of a confession," court concluded its erroneous admission constituted substantial risk of miscarriage of justice); Commonwealth v. Freeman, 352 Mass. 556, 561-564 (1967) (erroneous, unobjected-to charge on admissions by silence that may have materially influenced jury created substantial risk of miscarriage of justice -- notwithstanding that other evidence "warranted the verdicts").
     Because of the defendant's confession's likely impact on the jury, I am left with a serious doubt whether the result of the trial might have been different had the confession not been admitted, as well as "uncertainty that the defendant's guilt has been fairly adjudicated" (citation omitted).  Azar, 435 Mass. at 687.[23]  Thus, I believe the admission of the defendant's confession constituted a substantial risk of a miscarriage of justice.
     5.  Authority to vacate conviction.  Concluding that a substantial risk of a miscarriage of justice exists, I disagree with the court's suggestion that vacating the defendant's conviction is impermissible because the defendant raises his invocation claim for the first time on direct appeal.  See ante at       .  In fact, the court further posits that we should exercise our discretion to review a defendant's unpreserved claims on suppression issues for a substantial risk of a miscarriage of justice only if the outcome of the case will remain unchanged.  Id.  Accordingly, the court's dicta imply its serious reservation in starting down a road of review that might mar our appellate institutions' record of reviewing such claims for a substantial risk of a miscarriage of justice yet never once finding a risk exists and consequently vacating a conviction; indeed, convictions remain undefeated after decades of such reviews by our appellate courts.  As such, the court's interpretation of our precedent represents less a standard of review than a standard of affirmation.  Yet any standard of review shaped by fealty to procedural compliance, and beholden to a preordained adverse finding for the defendant is unfair, punitive, and fails to properly safeguard an individual's rights under the Massachusetts Declaration of Rights and the United States Constitution.[24]
     The Supreme Judicial Court has, of course, set a high burden for a defendant to obtain relief from a conviction as here;[25] however, the burden must not be utterly unattainable.  And it is not without precedent for the court to reverse a decision of the trial court on a newly raised claim if the public interest is implicated.  See, e.g., Commonwealth v. Morrissey, 422 Mass. 1, 4-6 & n.5 (1996) (court considered public interest ramifications in operating under influence of alcohol prosecutions before vacating District Court suppression order based on issue Commonwealth raised for first time on appeal).[26]
     This appeal of a waived suppression claim presents the rare instance where reversal is warranted considering the record is clearly adequate for review, the Commonwealth does not oppose reaching the merits, the matter is fully briefed, the constitutional violation is readily apparent, the risk of a miscarriage justice is grave, and reversal is in the public interest.  Specific to the latter point, it is in the public interest for this court to vacate a conviction of rape after concluding that police misconduct created a substantial risk of a miscarriage of justice and led to an unjust conviction.  The public interest is served when the police are deterred from obtaining confessions at the expense of an individual's constitutional rights.  And, the public interest is further served by the restoration, even if temporary pending a retrial, of freedom and other fundamental rights, to the defendant.
     Thus, I dissent.  I would vacate the conviction and remand for a new trial.
footnotes

     [1] The defendant also appeals from the denial by a single justice of this court of his motion for a stay of execution of sentence pending appeal, Mass. R. A. P. 6 (b), as appearing in 481 Mass. 1608 (2019).  "[O]ur decision here renders this portion of the appeal moot."  Commonwealth v. Knowles, 92 Mass. App. Ct. 617, 618 n.1 (2018).  In any event, we discern no abuse of discretion in the single justice's determination that the defendant had not met his burden to show by a preponderance of the evidence that a stay would not pose a security risk.  See Commonwealth v. Kalila, 493 Mass. 636, 641-642 (2024).
     [2] The grand jury also indicted the defendant for rape by putting his fingers in the victim's vagina and for indecent assault and battery by putting his hand to the victim's breast.  The trial jury acquitted him of those offenses.
     [3] The victim's cell phone could be unlocked with her thumbprint.
     [4] Pursuant to a search warrant for the defendant's cell phone, police later obtained data evidencing those communications.
     [5] It would be expected to be found in approximately one in seventy-nine octillion African-Americans, one in 2.5 nonillion Caucasians, and one in six nonillion Hispanics.
     [6] Detective Goff said, "I have incontrovertible scientific proof," but the words "incontrovertible scientific" were redacted from the audio-video exhibit submitted to the jury.
     [7] The defendant has not argued, here or in the trial court, that his statements in the September 9 telephone call should have been suppressed, and so we do not consider that issue.
     [8] The DNA report is not in the record, and so we cannot determine if Detective Goff accurately summarized its contents, or if it contained a "report[] of rape" that he was required to keep confidential, see G. L. c. 41, § 97D.
     [9] Other than cases arising under G. L. c. 278, § 33E (§ 33E), we are aware of no case reversing a conviction on direct appeal based on a waived suppression issue.  Of the § 33E cases cited by the dissent, only Commonwealth v. Smith, 473 Mass. 798 (2016), resulted in reversal.  And in Commonwealth v. Bradshaw, 385 Mass. 244, 259 (1982), the court made clear that it was reviewing the waived issues "only by virtue of [its] limited power under G. L. c. 278, § 33E."  See Commonwealth v. Bettencourt, 447 Mass. 631, 633-634 & n.2 (2006) (Commonwealth generally cannot obtain reversal of suppression decision on ground not raised to motion judge); Commonwealth v. Quint Q., 84 Mass. App. Ct. 507, 514 (2013) (Bettencourt rule "also appl[ies] to defendants and arguments not made below").
     [10] The Commonwealth understandably reads our decision in Commonwealth v. Santos, 95 Mass. App. Ct. 791, 795-797 (2019), to require review of the defendant's waived claim for a substantial risk of a miscarriage of justice.  In Santos, however, the court ultimately declined "to reach the merits of the issue raised for the first time on appeal because it depend[ed] on the development of facts not in the record."  Id. at 798.  We conclude likewise here.
     [11] The dissent states contrarily that the detective's refusal to produce the DNA report "caused the defendant to attempt to abruptly end the interrogation."  Post at    .
     [12] Defense counsel also told the jury in his opening statement that the defendant would testify that he and the victim had consensual sex.
footnotes for dissenting

     [1] The merits of the invocation claim are discussed in greater detail, infra at    . 
     [2] The court conducted its review in Smith, 473 Mass. at 799, pursuant to G. L. c. 278, § 33E.
     [3] I do not share the court's inference that the Commonwealth mistakenly relied on our decision in Commonwealth v. Santos, 95 Mass. App. Ct. 791, 795-797 (2019), in support of its request that this court review the defendant's claim for a substantial risk of a miscarriage of justice.  Ante at     .  In reviewing the Commonwealth's argument on appeal, I credit the Commonwealth for recognizing that the adequacy of the record and the nature of the newly raised claim support this court's review of its merits.
     [4] The defendant first stated, "Then I can't answer any other questions."  The Commonwealth argued the detective, in response to this statement, "properly sought clarification" by asking, "What's that?"      [5] "[M]aking deliberate and intentionally false statements to suspects in an effort to obtain a statement . . . is just one factor to be considered in analyzing the totality of the circumstances" as to the voluntariness of an admission (quotation omitted).  Commonwealth v. Neves, 474 Mass. 355, 362 (2016).
     [6] For instance, we have recognized that it is not uncommon for criminal defendant appellants in this court, who seek relief through ineffective assistance of counsel claims, to represent on appeal that they were unable to obtain cooperation from prior counsel whose assistance is the subject of the claim.  See, e.g., Commonwealth v. Miller, 101 Mass. App. Ct. 344, 352 (2022) ("[W]e have recognized that prior counsel may repeatedly refuse to respond to communications from successor counsel or may refuse to provide an affidavit despite having favorable information to assist the former client").
     [7] The Fifth Amendment provides in relevant part:  "No person . . . shall be compelled in any criminal case to be a witness against himself."
     [8] Article 12 provides in relevant part:  "No subject shall . . . be compelled to accuse, or furnish evidence against himself."
     [9] In Commonwealth v. Howard, 469 Mass. 721, 733 n.13 (2014), S.C., 479 Mass. 52 (2018), the court explained that the statement, "'I would like to stop at that point,'" when taken in context, "should raise a red flag for an interrogating police officer -- a signal that it is necessary at the very least for the officer immediately to pause in order to reflect on what the defendant has just said, and to consider whether the defendant is seeking to invoke his right to remain silent."  In Smith, 473 Mass. at 808 n.15, the court extended that rule to the statements "I'm done talking" and "I don't wanna talk no more."
     [10] The court suggests that it is unclear whether the detective heard the defendant's first statement, "Then I can't answer any other questions."  See ante at      .   Assuming arguendo that the first statement was inaudible, the defendant's second statement, made in response to the detective's clarifying question, "What's that?" was indisputably audible to the detective.  Given that context, a reasonable detective would have understood that the defendant -- in responding to "What's that?" -- was repeating his first expression of attempting to stop the interrogation; it follows that a reasonable detective would have concluded that the defendant had twice attempted to invoke his right to remain silent.
     [11] Assuming, arguendo, that the defendant's invocation was reasonably ambiguous, it would have been proper for the detective to stop the interrogation and ask the defendant a simple clarifying question like the following:  "I just want to be sure I understand your request.  Do you want me to stop questioning you unless I show you the report?"
     [12] In Mosley, the Court identified various factors that led to its conclusion that the police had fully respected the defendant's "right to cut off questioning" (citation omitted).  Mosley, 423 U.S. at 104-107.  The Supreme Judicial Court has described the Mosley factors as follows:  whether "the police (1) had immediately ceased questioning; (2) resumed questioning 'only after the passage of a significant period of time and the provision of a fresh set of warnings'; and (3) limited the scope of the later interrogation 'to a crime that had not been a subject of the earlier interrogation'" (citation omitted).  Clarke, 461 Mass. at 344.  None of these factors is present here.
     [13] The Commonwealth does not argue that the defendant waived his right to remain silent based on his statements following his invocation.  See Commonwealth v. Contos, 435 Mass. 19, 30 (2001) ("Statements obtained following an invocation of the right to counsel are presumed involuntary unless the Commonwealth proves beyond a reasonable doubt that the defendant 'initiate[d] further communication, exchanges, or conversations with the police,' and thereby voluntarily, knowingly, and intelligently waived his right to counsel" [citation omitted]).
     [14] In my de novo review of the recorded interrogation, I detect no sarcasm or exasperation, or other emotion which detracted from the plain, unambiguous meaning of the defendant's statements.  Instead, I observe a sincere attempt to communicate the refusal to answer any other questions.  See Commonwealth v. Tremblay, 480 Mass. 645, 646-647 (2018) (court conducts de novo review of documentary evidence on motion to suppress).
     [15]  There is no indication that the defendant had any prior experience with the criminal justice system.  Contrast Commonwealth v. Larkin, 429 Mass. 426, 438 (1999) (fact that "defendant was a veteran of the criminal process" supported voluntariness of statement to police).  In fact, the defendant testified that he had "never been in trouble with the law" before his arrest in the instant case, and that he had passed a criminal background check, a prerequisite to being hired by the rideshare company.
     [16] I disagree with the court's conclusion that there is tension between the defendant's invocation and voluntariness claims, or that counsel may have made a tactical decision to avoid bearing the burden of demonstrating a valid invocation.  As discussed supra at       , invocation and voluntariness are inextricably linked in this case.  As for the court's contention that the defendant may have strategically forgone bearing the additional burden of establishing invocation, see ante at   , it would have hardly been a significant risk or required much of an effort for the defendant to assume the burden by relying on the video recording and citing to the appropriate legal authority regarding invocation; the defendant gained nothing by not assuming that burden.  There would have been no reason for the defendant to present any additional evidence -- for instance, to call the defendant to explain his statements -- due to the objective nature of the invocation inquiry (viz., whether a reasonable police officer would have understood the defendant's statements to be an invocation of his Miranda rights).
     [17] The prosecutor emphasized the defendant's confession during cross-examination of the defendant and closing argument.
     [18] The DNA evidence would be inconsequential given the defendant's defense of consent.
     [19] The Commonwealth did not call three witnesses -- the roommate of the victim's friend and the two other passengers in the victim's rideshare vehicle who were dropped off in Cambridge -- all of whom closely interacted with the victim at the time she was allegedly very intoxicated, not long before the alleged rape.
     [20] The defendant was twenty years old when the interrogation occurred.  He emigrated from Haiti about seven years prior to the interrogation at issue.
     [21] Laken, the president and chief executive officer of a company "offering forensic services and biological consulting," received his Ph.D. in Cellular and Molecular Medicine from the Johns Hopkins Medical School.
     [22] The jury acquitted the defendant of a second count of rape and indecent assault and battery.
     [23] My prejudice analysis also leads me to conclude the erroneous denial of the defendant's motion to suppress his confession as involuntary was not harmless beyond a reasonable doubt.  See Delossantos, 492 Mass. at 253.
     [24] One of our appellate courts' greatest responsibilities is to ensure the rights of criminal defendants in Massachusetts are protected.  See Diatchenko v. District Attorney for Suffolk Dist., 466 Mass. 655, 668 (2013), S.C., 471 Mass. 12 (2015) ("We often afford criminal defendants greater protections under the Massachusetts Declaration of Rights than are available under corresponding provisions of the Federal Constitution"), and cases cited; Commonwealth v. Fini, 403 Mass. 567, 570 (1988) ("Of course, [the Supreme Judicial Court] is free to hold that art. 14 of the Massachusetts Declaration of Rights provides greater protection to defendants than is provided by the United States Constitution as interpreted by the Supreme Court").
     [25] "While we do have the power to consider [evidentiary suppression grounds newly raised on appeal], we exercise it only in the rare instance of a serious error which creates a substantial risk of a miscarriage of justice."  Garcia, 409 Mass. at 679.
     [26] Additional cases in which the court considered the public interest impact as a basis for reviewing a waived claim include Commonwealth v. Agosto, 428 Mass. 31, 35 & n.6 (1998) (court chose to address issue not raised before motion judge in order to provide guidance to Commonwealth on forfeiture issues), and Commonwealth v. Sheehy, 412 Mass. 235, 237 n.2 (1992) (court chose to address waived issue that was raised for first time on appeal and was "fully briefed and argued" to underscore basis of court rule).